Patrick T. HAIRSTON et al.,
Appellants,

v.

McLEAN TRUCKING CO., a corp. of Winston Salem, North Carolina, et al., Appellees.

No. 74–1750.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1975.

Decided Aug. 6, 1975.

Robert Belton, Charlotte, N. C. (Jonathan P. Wallas, J. LeVonne Chambers, Charlotte, N. C., Jack Greenberg and Morris J. Baller, New York City, on brief), for appellants.

Juan Rivera (William A. Carey, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Charles L. Reischel and Caliph Johnson, Washington, D. C., on brief), for amicus curiae United States E. E. O. C.

W. P. Sandridge, Winston-Salem, N. C. (Claude M. Hamrick, Winston-Salem, N. C., on brief), for appellees McLean Trucking Co. and Modern Automotive Services, Inc.

Jonathan G. Axelrod, Washington, D. C. (Hugh J. Beins, Washington, D. C., and Renn Drum, Winston-Salem, N. C., on brief), for appellee Local Union 391.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

In a class action brought by seventeen black employees under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the district court found that McLean Trucking Co. (McLean), a motor carrier, Modern Automotive Serv-

ices, Inc. (MAS), a wholly-owned subsidiary of McLean engaged in the business of repairing and servicing automotive equipment, and Local 391, International Brotherhood of Teamsters, Warehousemen and Helpers of America (Union), which represented the employees of McLean and MAS, engaged in employment practices which constitute present and continuing racial discrimination. Specifically, it was found that McLean's policy and practice of refusing to hire blacks as over-the-road drivers, and that of MAS in employing blacks only as garagemen and janitors were discriminatory and that certain no-rehire and no-transfer rules tended to prevent blacks from obtaining positions from which they were formerly excluded. It was found also that the policy and practice contained in contracts between MAS and the Union tended to perpetuate prior hiring discrimination.

The district court ordered substantial relief. It enjoined application of the no-rehire and no-transfer rules. It imposed racial quotas in the filling of vacancies in certain positions. It required that company seniority be afforded certain transferred employees. It ordered back pay for two of the named plaintiffs, but denied it for the others. And it awarded costs, reasonable attorney's fees and expenses.

Plaintiffs alone appeal, raising questions of whether they are entitled to greater relief than that ordered by the district court; the district court's basic conclusions of past and present illegal discrimination in employment are thus unchallenged. The questions presented are whether the district court was correct in (1) denying back pay to all affected class members except plaintiffs Hairston and Warren, (2) limiting the back pay award for plaintiff Warren to a period beginning in 1968, (3) limiting transfers to McLean by MAS employees to only over-the-road positions, and (4) continuing classification seniority for the promotion of affected class members of MAS who transfer to formerly all-white departments. We think that on this record plaintiffs are entitled to greater relief than was afforded them. We therefore vacate the decree and remand the case for formulation of a new decree granting further relief in accordance with the views we express.

I.

Since the district court's basic conclusions about past and present illegal discrimination in employment are unchallenged, a complete statement of their evidentiary basis is unnecessary. It suffices to say that McLean in its Winston-Salem operation—that which is the subject of this litigation—has two major work classifications: over-the-road drivers and terminal employees. Terminal employees fall into three subclassifications: switchers, checkers (who handle freight on the terminal's dock), and city drivers, who haul goods between the terminal and the customer. As of November, 1970, McLean had only nine black over-the-road drivers out of a total of 479. Until 1967, it had a policy of refusing to hire blacks as over-the-road drivers, and it departed from this policy then only after a series of meetings with EEOC and the Post Office Department. As of November, 1970, McLean had no black city drivers, nor had it ever had a black city driver among its terminal employees.

As of November, 1970, all, except one, of the black employees of MAS, the service subsidiary of McLean, were employed in the lowest-paid job classifications of garageman and janitor. Indeed, in 1963, MAS adopted an intentional and declared policy to employ only blacks in its tire recapping department, the employees of which were classified as garagemen. The policy was continued until May, 1969, almost four years after enactment of Title VII and a year after the present litigation was begun, when the first white garageman was employed in the tire recapping department. With only two exceptions, MAS had not posted job vacancies since the early 1960's.

McLean and MAS are operated, in many respects, as a single unit. They

have common officers and directors; MAS services McLean vehicles principally; McLean keeps personnel records for both companies; and McLean screens and tests applicants for employment for both companies at a single office staffed with McLean's employees. The final decision to hire is made by the supervisor of the department of the company where there is a vacancy to be filled.

Until enjoined by the district court in 1974, McLean and MAS had a policy of not rehiring a former employee of either company who had quit his job. With certain exceptions because of some special personal problem of the employee affected, McLean and MAS also had a policy prohibiting transfers by employees from one company to the other, or from one department in a single company to another department in that company. Employees could, however, change jobs within a single department of a single company. Until 1964, if they did so, they would lose seniority; but after 1964, they would retain departmental seniority. Since the only classification in the tire recapping and service lane departments of MAS is that of garageman, and the only classification in the janitorial department is janitor—the only departments in which blacks were employed—the incumbents had no opportunity for intradepartmental promotion or transfer, and they were barred from interdepartmental transfer or promotion within MAS or to McLean.

The facts sketch the pattern of discrimination in gross. Additional facts, supplying greater detail, will be stated in discussing the contention to which they relate.

## II.

We deal first with plaintiff's contention that the district court incorrectly denied all plaintiffs, except Hairston and Warren, back pay. Although the district court found that discrimination against blacks had been severe and systematic, its judgment provided that "[a]ll claims for relief in the nature of back pay are denied *in the discretion of the court* except . . . [the claims of Hairston and Warren]." (Emphasis added.) Hairston's and Warren's claims (which the district court taxed equally against McLean and MAS) were apparently allowed because they had sought and been denied employment as over-the-road drivers and were admittedly qualified for that position. In refusing relief for the other members of the affected class, the district court said, first, that the right to back pay may be defeated by the employer's showing of good faith in certain limited circumstances, but then it indicated that an employee's entitlement to back pay depended upon other equitable factors—his subjective intent as to whether he would have sought a different job, and when and how he made his desires known. In application of these principles to plaintiffs other than Hairston and Warren, the district court commented that there was no evidence that they sought a change in employment and some even rejected offered opportunities. The court noted that the pay differentials between positions at MAS were not great and that the earnings of McLean's over-the-road drivers varied greatly so that, as to them, computation of a back pay award would be "an adventure in speculation." In conclusion, the district court denied back pay to plaintiffs other than Hairston and Warren because only those two actually sought a change of employment and because "of the costs of administration in relation to any foreseeable return, as well as [because of] the speculative nature of any other possible claims."

We think that plaintiffs' request for back pay requires further consideration. We do not decide that awards to each plaintiff necessarily must be made; but if awards are denied, they may be properly denied only for reasons not heretofore advanced by the district court.

In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court formulated the rules regarding the award of back pay in Title VII cases where racial dis-

crimination in employment is proved. It said that the award was discretionary, depending upon the facts of a particular case, but it sharply limited the area in which discretion was to be exercised. First it said that discretion is to be exercised in accordance with the " 'large objectives of the Act' " (citation omitted): (1) as a " 'spur or a catalyst' " to motivate employers and unions to cease discrimination and eradicate its effects, and (2) to "make whole" those who have suffered economically by reason of discrimination. 422 U.S. at 416–418, 95 S.Ct. 2362. In order that back pay awards should achieve these objectives, it is necessary that an award be "reasonably certain" in the event of a violation. 422 U.S. at 417, 95 S.Ct. 2362. The intent of Congress in enacting Title VII was, the Court found, that back pay was to be awarded according to the practice under the National Labor Relations Act, under which back pay is awarded "as a matter of course—not randomly or in the exercise of a standardless discretion, and not merely where employer violations are peculiarly deliberate, egregious or inexcusable." 422 U.S. at 420, 95 S.Ct. at 2372.[1]

■ The Court also articulated the rule for awarding back pay negatively, saying:

[G]iven a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. (Footnote eliminated.) 422 U.S. at 421, 95 S.Ct. at 2373.

Significantly here, *Albemarle Paper Co.* rejected the contention that back pay should not be awarded unless it is shown that an employer practiced racial discrimination in bad faith:

[T]he mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employer's favor. . . . Title VII is not concerned with the employer's "good intent or absence of discriminatory intent" for "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. (Emphasis in original.) 422 U.S. at 422, 95 S.Ct. at 2374.

Thus it is clear that the district court's suggestion that an employer's good faith may defeat a claim for back pay is not well founded.

■ In the light of what was said in *Albemarle Paper Co.,* we turn to the other reasons assigned by the district court for denying back pay. The fact that a plaintiff did not request transfer or promotion is, of course, relevant. But clearly, it is not dispositive. Even from our brief discussion of the employment practices and policies of McLean and MAS, it is apparent that such a request would have been futile. The no-tranfer policy meant that blacks were denied promotion out of the low-paying departments to which they were initially assigned. The no-rehire policy meant that a black could not resign and seek to be rehired into a better job, even if the employee were willing to assume the risk of reemployment and forfeiture of seniority. Moreover, vacancies were not posted; thus the plaintiffs were ordinarily denied even the knowledge necessary to make the futile gesture. Nonetheless, the record reflects that Kimber, Neal and Wynecoff sought a tire delivery job when they learned that it was about to become vacant, only to be reminded of the no-transfer policy; and there is evi-

---

1. As indicative of the practice to be followed under Title VII, the Supreme Court quoted with approval the following language from *NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 178 (2 Cir. 1965): "The finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer . . . ." 422 U.S. at 420, n. 12, 95 S.Ct. at 2373. The Court further noted that the NLRB has "[p]ursued 'a practically uniform policy [of awarding back pay] with respect to these orders requiring affirmative action.' " (Citation omitted.) 422 U.S. 420, n. 12, 95 S.Ct. at 2373.

dence that when some of the plaintiffs expressed concern about the dead-end nature of their jobs, they were told that they could leave if they did not like it.

To accept these barriers to promotion and transfer as a rationale for denying back pay would, in our view, manifestly frustrate the "broad objectives" of Title VII. If an employer can avoid back pay liability through a policy which makes an attempt to gain a better job risky or futile, then this subtle form of discrimination is encouraged, not discouraged.[2] Similarly, plaintiffs harmed by such policies—plaintiffs deterred by the futility or risk of seeking promotion—are denied an award which would "make them whole," not because they were not disadvantaged by discrimination, but merely because of the peculiar method by which discrimination was implemented.

■■ Of course if, notwithstanding the usual policies of McLean and MAS, a particular plaintiff was offered and refused a promotion or transfer, his refusal could disqualify him from a back pay award. But before such a refusal may be treated as an absolute bar to the award, the plaintiff's reasons for his action must be determined and weighed. If the employee was motivated by reasonable reluctance to expose himself to another aspect of an employer's discriminatory employment policy, as, for example, a discriminatory loss of seniority or discriminatory· testing of "qualifications," then his refusal would not legally be entitled to any weight as a defense to a subsequent claim to back pay. Similarly, a plaintiff who refuses offered promotion into one job for personal reasons does not thereby disqualify himself for a back pay award based on an employer's discriminatory refusal to allow the employee to transfer into other jobs he desired and was qualified for. Only if the refusal was a free and voluntary act on the part of the employee, not constrained by any discriminatory employer practice or policy, could it be concluded that the employee was barred from claiming back pay. In the present case, there is only one plaintiff who indicated he did not want some job other than those to which black employees had been restricted.

■■ The qualifications of an employee for the job denied him, as a basis for an award of back pay, are, of course, highly relevant. One cannot be compensated for denial of a job he could not perform, but the record is singularly deficient in proof that any plaintiff was not qualified for any vacancy which occurred. A black plaintiff, in a case of this nature, cannot be found to be disqualified for another position unless he lacks the qualifications required to fill the position at the time it was filled (not current hiring standards) and unless his qualifications fall short of those of white employees actually employed at or about the time that vacancies in jobs of that category were filled. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Cf. *Young v. Edgcomb Steel Co.,* 499 F.2d 97, 99–100 (4 Cir. 1974).

■■ We turn next to consideration of the district court's assignment of factors of costs of computing back pay in relation to the amounts to be awarded and the speculative nature of the awards as reasons for denying back pay. In regard to the latter, we reject the notion that an employer who has practiced ra-

---

**2.** In other areas of Title VII relief, the law does not require a·futile act as a precondition of relief. See, e. g., *United States v. Sheet Metal Workers International Union, Local 36,* 416 F.2d 123, 127 (8 Cir. 1969); *Bing v. Roadway Express, Inc.,* 485 F.2d 441 (5 Cir. 1973). No more do we think that it requires a futile act as a prerequisite to an award of back pay. See *Head v. Timken Roller Bearing Co.,* 486 F.2d 870, 878 (6 Cir. 1973). Compare *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 422 (6 Cir. 1974). The *Thornton* court upheld a denial of back pay based in part on the fact the plaintiffs had not sufficiently manifested interest in promotion before the suit commenced. It was emphasized, however, that, in the *Thornton* situation, such action would not have been futile; a circumstance which sufficiently distinguishes the present case, where the futility of efforts to advance are apparent from the letter of company policy.

cial discrimination in employment may avoid redressing the wrong inflicted on the ground that the resulting injury is not capable of precise measurement. Class actions for back pay under Title VII are inherently complex; the computation of individual awards necessarily involves speculation: what the plaintiffs would have received *but for* discrimination. Moreover, as grosser forms of discrimination give way to more subtle ones, even greater complexity is introduced into the hypothetical inquiry. But Title VII condemns subtle as well as gross discrimination, and our duty to redress all forms of discrimination is clear. Like a jury's determination of compensation for pain and suffering in a suit for personal injuries, "unrealistic exactitude is not required" in back pay determinations; and because of the nature of the case, "uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer." *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1380, n. 53 (5 Cir. 1974). See also *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5 Cir. 1974).

 We do not conceive that plaintiffs can be said to have suffered no economic loss or at most only a *de minimis* loss. Plaintiffs' statistical evidence tends to show consistent disparity in wage rates between the job classifications filled mainly with black employees and those which have been filled overwhelmingly with white employees. If plaintiffs have suffered loss, they should be compensated. Even if we assume that the parties cannot settle plaintiffs' claims by negotiation and agreement, it does not follow that the costs in money or in judicial time of adjudicating the amounts to be awarded should be inordinate. A case of this type is a classic one in which to refer the actual computations of amounts due to individual plaintiffs to a master. Rule 53, F.R.Civ.P. See *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4 Cir. 1971). And since the necessity of resort to a master results from the discriminatory employment practices of McLean and MAS, they should bear his costs as well.

Accordingly, as to award of back pay in general, we vacate and remand for further proceedings in accordance with these views.

### III.

Although the district court awarded back pay to Warren, it restricted his recovery from an undetermined date in 1968 on the ground that it was not until then that Warren made known his desire to become an over-the-road driver. Warren was employed by MAS on June 22, 1964. Other than indicating that Warren's recovery should date back to the undetermined date in 1968 when he first made known his desire to be an over-the-road driver, the district court ordered that, on motion of either party, the matter would be referred to a Magistrate for more exact determination. No such request has been made.

Defendants argue that this aspect of the case is not appealable because no final judgment as to Warren has been entered. It is true that the precise amount of what the district court has ruled that Warren is entitled to recover has not been fixed, but the standard for measurement has been ascertained—erroneously, we conclude—and we will therefore rule on the contention and put the matter to rest.

 If Warren's articulation of his aspirations to become an over-the-road driver were the test, it is not true that Warren did not give birth and voice to them until 1968. In May, 1967, he filed a charge with EEOC complaining about his inability to get a job as an over-the-road driver and he stated that he sought such employment as early as 1966. But what is more important, however, is that, although Warren had had previous experience as a truck driver, from the date of his first employment until October, 1967, McLean had an admitted policy of refusing to consider blacks for over-the-road jobs. Had he sought the

position when first employed or any time thereafter until 1968, his efforts would have been futile. For the reasons previously expressed, we therefore conclude that Warren should recover back pay to July 2, 1965, the effective date of Title VII.

## IV.

As part of the relief it granted, the district court directed that employees of MAS be allowed to transfer to over-the-road driver positions at McLean. It did not extend this relief to *every* position at McLean but restricted it to over-the-road drivers. Before us, plaintiffs contend that transfer relief for employees of MAS should extend to any and every position at McLean.

Defendants counter by asserting that transfer relief beyond that of transfers to over-the-road driver positions is not an issue before us because, they argue, it was not raised in the pleadings, in the pretrial order defining the issues, or in the plaintiffs' proposed final judgment, nor was it pressed in the district court at the trial. The district court's opinion made findings of fact with regard to the explanation advanced by defendants for prohibiting transfers between MAS and McLean and found that the reasons given in support of the no-transfer policy "often appear to be frivolous." The district court's principal discussion, however, centered upon transfers from MAS to McLean over-the-road driving jobs, although the district court did say that both McLean and MAS dislike "job transfers" (without specification of over-the-road jobs) because they prefer not to be faced with the necessity of retraining employees. Later in the discussion portion of the opinion, the court adverted only to intercompany transfers by MAS employees to over-the-road jobs at McLean.

As we read the complaint and the pretrial order, both are broad enough to put in issue the whole question of transfers, including transfers by employees of MAS to any job classification at McLean. Given the severity of past discrimination practiced by McLean and MAS, we think that transfers by MAS employees to any vacant position at McLean may be an appropriate remedy unless there is a valid business reason why transfers should be restricted to over-the-road driver positions or to certain other categories. If there is such a valid reason, the district court has not yet made a finding in that regard, so that we cannot presently say that plaintiffs should not be afforded the relief that they ask.

Of course it may well be that the matter of transfers by MAS employees to McLean in positions other than over-the-road drivers was not vigorously pressed in the district court, even though technically it was raised in the pleadings. Since the case must be remanded on the issue of back pay, we think it appropriate that the district court consider further plaintiffs' requested transfer relief. The present record may permit the district court to make findings as to whether or not there is any valid non-discriminatory business reason to allow transfers only to over-the-road driver positions, or to restrict transfers to other categories less than all; but, if not, the district court is at liberty to take additional evidence should McLean and MAS have additional relevant proof which they failed to offer at the initial trial.

## V.

Prior to entry of the district court's decree, MAS had only classification seniority—that is to say, seniority for the employee in the position in which he was employed. Should he be promoted or transferred to another job in another classification, he would lose his accumulated seniority and begin to accumulate seniority anew. This rule of seniority was embodied in MAS's bargaining agreements and memoranda of understandings with Local 391.

In connection with enjoining the restrictions on interdepartmental transfers at MAS and transfers of MAS em-

ployees to over-the-road positions at McLean, the district court modified MAS's classification seniority to provide that transfers to new departments should be determined by company seniority but that promotions within the new departments would be governed by classification seniority. Layoffs, however, would be governed by company seniority.

Plaintiffs argue that they and the affected class should be entitled to company seniority for all purposes, and we agree. It is at once apparent that classification seniority, coupled with a no-transfer rule and a deliberate policy of employing blacks in only the lowest-paid classifications, serves to perpetuate past racial discrimination even if the no-transfer rule is enjoined and if employment opportunities for blacks in higher-paid classifications are opened up. As such, the continuation of classification seniority would itself violate § 703 of Title VII, 42 U.S.C. § 2000e–2. See *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4 Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *United States v. Chesapeake & Ohio Ry. Co.,* 471 F.2d 582 (4 Cir. 1972), cert. denied, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973).

The district court seems to have recognized the principle we have stated. It granted partial relief but it withheld full relief to insure that employees would not advance to higher positions before they had adequate experience and training. The district court appears also to have been influenced by the fact that classification seniority was the system established by bargaining between the parties.

The withholding of full relief as prayed was error. Bargaining agreements, if they are in violation of law, are not binding. The legitimate objective of insuring that promoted employees have the necessary training and experience to perform more demanding jobs can be met in other ways, such as training programs, minimum tenure, and probationary periods. The fact is that this record discloses no legitimate business reason why classification seniority for plaintiffs and the affected class should be continued, and that is the only basis on which the law will permit even its limited perpetuation in a case of this type. *Robinson v. Lorillard, supra.* Indeed, the record contains affirmative evidence that there are no jobs or series of jobs at MAS which an employee must perform to become qualified to do other jobs and that there is no definite progression period from the helper classification to journeyman.

The district court should enjoin classification seniority, but it may, of course, approve other non-discriminatory devices to assure proper qualification and training.

*Vacated and remanded.*