412 F.Supp. 530 (1975)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
LOCAL 2P, LITHOGRAPHERS & PHOTOENGRAVERS INTERNATIONAL UNION, a/k/a Baltimore Lithographers & Photoengravers Union, Local 2P, a/k/a Local 2P, Graphic Arts International Union, AFL-CIO, Defendant.
Civ. A. No. M-74-579.
United States District Court, D. Maryland.
December 22, 1975.
Supplemental Memorandum and Order January 16, 1976.
Second Supplemental Memorandum February 26, 1976.
*531 Frank J. Tuk, Associate Regional Atty., and James E. Rumsey, Asst. Regional Atty., Equal Employment Opportunity Commission, Philadelphia, Pa., for plaintiff.
Bernard W. Rubenstein, Ann F. Hoffman and Edelman, Levy & Rubenstein, P. A., Baltimore, Md., for defendant.
JAMES R. MILLER, Jr., District Judge.

OPINION
This is a suit brought by the Equal Employment Opportunity Commission (EEOC) under the provisions of § 706(f) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5, alleging that defendant, Local 2P, Graphic Arts International Union, AFLCIO, (formerly known as Baltimore Lithographers and Photoengravers Union, Local 2P, and also formerly known as Local 2P, Lithographers and Photoengravers International Union) has engaged in racially discriminatory admission practices which caused damage to William A. L. Lewis and his brother, now deceased, Tazewell M. Lewis, both black males. The plaintiff seeks back pay for William Lewis and for the estate of Tazewell Lewis as well as injunctive relief relating to William Lewis and to blacks generally.
William Lewis and his brother, Tazewell, started working as apprentices in the photoengraving trade at the Afro-American Newspaper in Baltimore in 1935. They became journeymen photoengravers in 1941. William Lewis remains employed at the Baltimore Afro-American up to the present time, and Tazewell Lewis remained employed there until his death in December, 1970. They were both competent photoengravers.
*532 In the middle 1950s, the Lewis brothers, aware that wage scales for members of Local 2P were higher than those in the photoengraving shop at the Afro-American, made inquiry at several commercial printing shops in the Baltimore area and at one or more of the other Baltimore metropolitan daily newspapers relative to employment but were told that they would have to be members of Local 2P in order to be employed at those places since each of those employers had a union shop.[1] The Lewis brothers were aware that Local 2P had no black members and that William and Tazewell Lewis were, in fact, the only black photoengravers in the Baltimore area at that time.
The Lewis brothers were both members of the United Papermakers and Paperworkers International Union, which represented the workers at the Afro-American. While not particularly interested in joining Local 2P for its own sake, the Lewis brothers decided that membership in Local 2P was necessary in order for them to be able to obtain work anywhere other than at the Afro-American and to improve their wage scales.
In the middle 1950s, the Lewis brothers went with John Quarles, a black photoengraver who became a journeyman in approximately 1953, to see Mr. Schnitzer, then President of Local 2P. The three of them told Mr. Schnitzer that they wished to be considered for jobs in the Baltimore metropolitan newspapers other than the Afro-American and that they wanted to get into the union if that was what was required. Mr. Schnitzer, although indicating that he would see what he could do about finding jobs for one or all of the three black men, did not again contact them.
In 1963 the Lewis brothers wrote to the predecessor of the Graphic Arts International Union and to Local 2P seeking membership in the union to no avail. Ultimately they filed a complaint in August, 1963, with the City of Baltimore Equal Employment Opportunity Commission (later known as the Baltimore Community Relations Commission), alleging that they had been discriminated against in being denied admission to Local 2P. In connection with that proceeding, the responsible officials of Local 2P became aware that the Afro-American local of the United Papermakers and Paperworkers Union had released the Lewis brothers from membership contingent upon their being received into the membership of Local 2P, but there is no evidence that the International Union agreed to the release. After the Baltimore Community Relations Commission ruled in favor of the Lewis brothers on the complaint which had been filed in August, 1963, they again applied for membership in Local 2P in August, 1964. These applications were denied in October, 1964, on the ground that the Lewis brothers did not come within the historic and traditional tripartite standards for admission which were: (1) admission to Local 2P through the apprenticeship programs; (2) admission to Local 2P through organization by Local 2P of a shop or plant in which the prospective member was then employed; (3) admission to Local 2P by virtue of employment by a union shop employer of a non-union member in circumstances in which Local 2P did not refer a competent journeyman for an open position within 30 days.
On December 29, 1965, the Lewis brothers again by letter inquired of Local 2P concerning the procedures for becoming members and on January 4, 1966, filed applications for membership. This occurred at or about the time when the prior order of the Baltimore Community Relations Commission was vacated on appeal. On March 18, 1966, Local 2P, by letter, advised the Lewis brothers that their applications had been disapproved, again referring indirectly to the normal tripartite standards for admission *533 to membership. The union's letter stated in part that it was:
"concerned with organizing all photoengraving and lithography shops under its jurisdiction to protect and improve wage levels, benefits and general working conditions in the trade. It would be in our best interest, therefore, to include the Afro American photoengraving department in our union. May I suggest that an acceptable manner of obtaining membership is to help organize the photoengraving department of Afro American. The Local would gladly cooperate with you in this project provided, of course, that it does not expose itself to the charges of raiding by the United Papermakers and Paperworkers International Union under whose jurisdiction the department is presently organized.
"I would be pleased to discuss this matter with you at your convenience."[2]
William Lewis, when he received the aforesaid letter, believed the suggestion that Local 2P organize the Afro-American photoengraving shop was a "subterfuge." Although at that time he and his brother, Tazewell, were the only two non-supervisory photoengravers working at the Afro-American and therefore constituted the entire bargaining unit for the photoengraving trade, the Lewis brothers were aware that the management of the Afro-American was not receptive to an organization of the photoengraving shop there by Local 2P.
In August, 1967, then Governor Spiro Agnew attended a meeting between representatives of Local 2P and the Lewis brothers. At that meeting, the officials of Local 2P indicated that they would accept the Lewis brothers into membership. While no conditions were expressly stated, the court finds that it was implied that the normal conditions of application for membership relating to nonracial matters would be complied with.
On or about August 18, 1967, the Lewis brothers returned completed application forms to Local 2P with checks for the membership application fee, but declined to send to Local 2P the "authorization cards" which Local 2P had requested be signed and returned.
Under § 101.17 of the National Labor Relations Board Statement of Procedures, Series 8 as amended, an "authorization card" is evidence that a labor organization has been authorized to represent the employee whose name and signature is on the card for the purposes of collective bargaining in a bargaining unit appropriate for such bargaining. See 29 U.S.C. §§ 159(a) and 159(c)(1)(A).
The Lewis brothers felt that the requirement that they sign an "authorization card" was a subterfuge on the part of Local 2P. They requested a refund of the application fees in early September, 1967, when they learned that Local 2P insisted that authorization cards be signed. At that time the Lewis brothers were still the only two non-supervisory photoengravers working at the Afro-American, but were aware that the management of the Afro-American was still not in favor of organization of the photoengraving unit by Local 2P. Furthermore, William Lewis testified that he and his brother, having previously fruitlessly sought other employment, were at that time ". . . not really trying to leave the Afro.[3]
*534 On August 31, 1967, Local 2P notified the Lewis brothers that there were several positions for photoengravers vacant in Cleveland, Ohio, and suggested that they could become members of the Cleveland, Ohio local of the international union if they were successful in obtaining those positions. The letter went on to say:
"As you know, there are currently no jobs available in the Baltimore area. In addition to this I am certain that you are aware that by virtue of the strike against the Publicity Engraving Company and the closing of the Southern Engraving Company approximately thirty positions were lost in Baltimore. Most of these men became unemployed as a result of this loss of positions and obtained employment in cities other than Baltimore. All of them were members of the local union."[4]
The Lewis brothers notified Local 2P that they would accept positions in the Baltimore-Washington, D.C. area but not outside of that area.
Nothing was done by the Lewis brothers in reference to obtaining new employment or seeking membership in Local 2P between 1967 and 1970. On March 20, 1970, the Lewis brothers again filed an application for membership in Local 2P and received no response thereto. When the defendant Local received the applications, it referred them to its attorney, and no further action was taken by the Local. On or about August 17, 1970, the Lewis brothers filed their complaints with the EEOC which gave rise to the present suit. The complaints contained substantially identical language as follows:
"The Union refused to accept my application for membership and returned my membership fee. I understand that apprentices have been taken into the Union since I applied. I am a journeyman with more than 20 years' experience. There are no Negroes in this Local Union 2P."[5]
The date of discrimination was alleged to have been June 2, 1970.
The active membership of Local 2P at the present time includes approximately 130 journeymen members and approximately 10 apprentice members. At the time of trial, there were no black journeymen in Local 2P and only one black apprentice. The one black apprentice had been placed by management and not by Local 2P, there being a procedure under which management and the union at Alco-Gravure, Inc. alternated in designating apprentices at that plant. There are only four black journeymen photoengravers in the Baltimore area at the present time, all of whom are employed at the Afro-American.
The evidence at trial was that the apprenticeship lists of Local 2P are drawn up in a nepotistic fashion, some infants as young as two years old being on the list, and that no opportunities are given to blacks by Local 2P to be named to the apprenticeship list. There was further evidence from which the court has found that Local 2P followed a general practice of circulating notice of job vacancies by word of mouth or at union meetings rather than by posting them in the union shops or otherwise circulating them in such a way that "outsiders" would be aware of the job vacancies. There further was evidence that the officers of Local 2P were not aware of any duty on their part to refer non-union members to job vacancies, N.L.R.B. v. Local 111, United Bro. of Carpenters, Etc., 278 F.2d 823 (1st Cir. 1960); N.L. R.B. v. International Longshore. Ass'n, Loc. No. 1581, 489 F.2d 635, 637 (5th Cir. 1974), and that they did not do so.
The effect of these policies has been effectively to exclude blacks from membership in Local 2P.
Prior to the late 1950s the printing shops in Baltimore except for the Afro-American *535 had an "all white" hiring policy in the subject trades. While perhaps neutral on their face, nevertheless the membership policies of Local 2P, directly related as they are to the past membership of Local 2P, made it unlikely, if not impossible, that blacks would be in a position to compete for jobs in the photoengraving or lithographers trade in Baltimore anywhere except at the Afro-American. These policies perpetuated the effects of past racial discrimination and segregation. It is not surprising, therefore, that, of the four journeymen black photoengravers in the Baltimore area, all work at the Afro-American nor that there are no black journeymen members of Local 2P although the percentage of the Baltimore area work force which is black is approximately 21.9%. The record further establishes that at least 35 white persons have become members of Local 2P since July 2, 1965, the effective date of Title VII, and that of that number at least nine have become members since June, 1970.
The membership practices and policies of Local 2P, in the context of past racial discrimination in the subject trade, have been amply proved by the statistical evidence in this case to be racially discriminatory in their effect. Russell v. American Tobacco Co., 528 F.2d 357 (4th Cir. 1975); Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975); Barnett v. W. T. Grant Company, 518 F.2d 543 (4th Cir. 1975); see also Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).
The court finds that the failure of the Lewis brothers to sign the authorization cards in 1967 and their withdrawal of their membership applications at that time does not, under the circumstances here, amount to a waiver of, or an acquiescence in, the discriminatory practices of Local 2P. Although they had asked Local 2P to be referred for jobs in the Baltimore-Washington area, in 1967 as well as before, no such referrals were made. Subsequent to 1967, at least nine photoengravers (all of them white) were referred to the Alco-Gravure, Inc. plant in Glen Burnie by Local 2P for re-training and employment in the gravure process. By their own admission, the officers of Local 2P did not recognize any obligation on their part to refer non-members for job vacancies. Under these circumstances, the Lewis brothers were not required to jeopardize their jobs in 1968 and thereafter at the Afro-American by seeking to "organize" its photoengraving department when the prospects of their obtaining referrals to other jobs through Local 2P were, based upon past experience, minimal if not non-existent. Hairston v. McLean Trucking Co., supra, 231-232.
That the officers of Local 2P have recently furnished Alco-Gravure, Inc. the name of a black man to be an apprentice in the trade at its plant in Glen Burnie is not dispositive of the back pay claims of the Lewis brothers. Even if the officers of Local 2P had acted in good faith in their actions toward the Lewis brothers, and blacks in general, without any overt intent to discriminate on the basis of race, back pay under the circumstances would still be due to the Lewis brothers since Title VII is concerned with the consequences of practices affecting employment and not simply with their motivation. Albemarle Paper Co. v. Moody, supra, at 422, 95 S.Ct. at 2374, 45 L.Ed.2d at 299; Hairston v. McLean Trucking Co., supra, at 231; see also Russell v. The American Tobacco Co., supra, 528 F.2d 357.
No credible explanation was offered by Local 2P at trial for its failure to respond to the 1970 applications for membership by the Lewis brothers. The record compels the conclusion that the responsible officers of Local 2P were aware at the time that the Lewis brothers were black and that they had been seeking membership in Local 2P as a means of improving their employment potential and remuneration for over 10 years. For all of those years the defendant maintained that there was no way it could provide union membership and job referral to the Lewis brothers outside of the "normal channels" by which people *536 are admitted into membership in Local 2P. However, the evidence has established that, throughout this period, journeyman positions became available in the Baltimore area and that the defendant, under the terms of its collective bargaining contracts, had the initial right in many, if not all shops, for a period of 30 days to refer journeymen for employment in those positions. The defendant, although requested so to do by the Lewis brothers, never recognized its admitted duty to refer non-union members, such as William and Tazewell Lewis, for such positions in order that they could have had the opportunity to receive both membership in Local 2P and employment as journeymen at union scale wages. The failure by the defendant to act on the 1970 application for membership by the Lewis brothers, coupled with the defendant's membership customs and practices having racially discriminatory consequences which tended to perpetuate past discrimination, justify the award of back pay to the plaintiff on behalf of the Lewis brothers for the period from August, 1968.
Under Title VII, back pay liability exists only for practices occurring after July 2, 1965, the effective date of the Act, and accrues only from a date two years prior to the filing of a charge with the EEOC. See 42 U.S.C. § 2000e-5(g). Therefore, the defendant's liability to the Lewis brothers for the assessment of back pay may not extend prior to August 17, 1968.
In many cases under Title VII just as in this one, the exact amount of back pay which an aggrieved party would have earned but for the prohibited discriminatory conduct of the defendant is difficult to determine with certainty. "Moreover, as grosser forms of discrimination give way to more subtle ones, even greater complexity is introduced into the hypothetical inquiry." Hairston v. McLean Trucking Co., supra at 233. The risks of uncertainty in calculating the amounts of back pay must fall on the defendant in view of what the Supreme Court in Albemarle Paper Co. called the "`large objectives of the Act'" (citation omitted), 422 U.S. at 416, 95 S.Ct. at 2370, 45 L.Ed.2d at 295. Hairston v. McLean Trucking Co., supra.
The evidence here showed that the union scale at the News American and at the Sunpapers bargained for by or on behalf of the defendant local was significantly higher than the scale paid during the relevant times at the Baltimore Afro-American. While the scale at Alco-Gravure was even higher than at the newspapers, the court, recognizing that to some extent any computation of back pay is uncertain, is of the view that it is appropriate to assess back pay under the circumstances here by using as a yardstick the day scale at the News American, thereby multiplying the appropriate News American hourly rate by the respective straight time hours (both day and night) which the Lewis brothers worked at the Afro-American[6] to arrive at a reasonably accurate estimated total amount which the Lewis brothers would have earned at Local 2P union scale rates but for the discrimination. From those totals must be subtracted the amounts actually earned at straight time by the Lewis brothers during the relevant periods at the Afro-American.
The court has, based upon the evidence and the aforesaid methodology, determined that the computations contained in the "Plaintiff's Statement on Damages" (Paper No. 39), to the extent they are consistent with the aforesaid methodology, are correct. Accordingly, the court has calculated that William Lewis would have earned at least the following estimated amounts at Local 2P union scale wage rates but for the discrimination:

*537
 August 17  October 26, 1968
 37.5 × $5.27[7] = $ 197.63
 307.5 × $5.27 = 1,620.53
 ________
 $ 1,818.16
 November 2  December 28, 1968
 37.5 × $5.27 = $ 197.63
 287.5 × $5.27 = 1,515.13
 ________
 $ 1,712.76
 ________
 Estimated Earnings Total 1968 .......................... $ 3,530.92
 ==========
 January 1  November 6, 1969
 1536 × $5.27 = $ 8,094.72
 November 7  December 31, 1969
 307.5 × $5.27 = $ 1,620.53
 ________
 Estimated Earnings Total 1969 ........................... $ 9,715.25
 ==========
 January 1  October 31, 1970
 1639.5 × $5.27 = $ 8,640.17
 November 7  December 31, 1970
 279.75 × $5.27 = $ 1,474.28
 ________
 Estimated Earnings Total 1970 ......................... $10,114.45
 ==========
 January 1  May 6, 1971
 513.5 × $5.27 = $ 2,706.15
 105 × $5.67 = 595.35
 __________
 $ 3,301.50
 May 7  November 7, 1971
 1004.5 × $5.67 = $ 5,695.52
 November 8  December 31, 1971
 232.5 × $5.67 = $ 1,318.28
 ________
 Estimated Earnings Total 1971 ......................... $10,315.30
 ==========
 January 1  May 6, 1972
 585 × $5.67 = $ 3,316.95
 90 × $6.02 = 541.80
 ___________
 $ 3,858.75

*538
 May 7  September 23, 1972
 688.25 × $6.02 = $ 4,143.27
 September 24  November 4, 1972
 223.5 × $6.02 = $ 1,345.47
 November 5  December 31, 1972
 217.5 × $6.02 = $ 1,309.35
 ________
 Estimated Earnings Total 1972 ......................... $10,656.84
 =========
 January 1, 1973  May 5, 1973
 60 × $6.23 = $ 373.80
 540 × $6.02 = 3,250.80
 82.5 × $6.23 = 513.98
 __________
 $ 4,138.58
 May 12  November 3, 1973
 805 × $6.23 = $ 5,015.15
 70.5 × $6.46 = 455.43
 __________
 $ 5,470.58
 November 11  December 31, 1973
 300.5 × $6.46 = $ 1,941.23
 ________
 Estimated Earnings Total 1973 ......................... $11,550.39
 ==========
 January 1  April 30, 1974
 501 × $6.46 = $ 3,236.46
 49.5 × $6.67 = 330.17
 ________
 $ 3,566.63
 May 1  November 7, 1974
 566 × $6.67 = $ 3,775.22
 90 × $6.91 = 621.90
 _________
 $ 4,397.12
 November 16  December 28, 1974
 262.5 × $6.91 = $ 1,813.88
 ________
 Estimated Earnings Total 1974 ......................... $ 9,777.63
 ==========
Total Estimated Earnings 1968-1974 ........................ $65,660.78
===========================================================================
 Actual Earnings  Straight Time Only
 August 17  October 26, 1968
 37.5 × $3.12 = $ 117.00
 307.5 × $3.253 = 1,000.30
 ________
 $ 1,117.30

*539
 November 2December 28, 1968
 37.5 × $3.29 = $ 123.38
 287.5 × $3.423 = 984.11
 ______
 $ 1,107.49
 ________
 1968 Earnings Total ........................................ $ 2,224.79
 ==========
 January 1November 6, 1969
 1536.5 × $3.423 = $ 5,259.44
 November 7December 31, 1969
 307.5 × $3.553 = $ 1,092.55
 ________
 1969 Earnings Total ........................................ $ 6,351.99
 ==========
 January 1October 31, 1970
 1639.5 × $3.553 = $ 5,825.14
 November 7December 31, 1970
 279.75 × $3.753 = $ 1,049.90
 ________
 1970 Earnings Total ..................................... $ 6,875.04
 ==========
 January 1May 8, 1971
 618.5 × $3.753 = $ 2,321.23
 May 9November 7, 1971
 1004.5 × $3.853 = $ 3,870.34
 November 8December 31, 1971
 232.5 × $4.003 = $ 930.70
 ______
 1971 Earnings Total ........................................ $ 7,122.27
 ==========
 January 1May 6, 1972
 675 × $4.003 = $ 2,702.03
 May 8September 23, 1972
 688.25 × $4.103 = $ 2,823.89
 September 25November 4, 1972
 223.5 × $4.483 = $ 1,001.95
 November 5December 31, 1972
 217.5 × $4.683 = $ 1,018.55
 ________
 1972 Earnings Total ........................................ $ 7,546.42
 ==========
 January 1May 5, 1973
 60 × $4.55 = $ 273.00
 622.5 × $4.683 = 2,915.17
 __________
 $ 3,188.17

*540
 May 12November 3, 1973
 875 × $4.783 = $ 4,185.13
 November 10December 31, 1973
 300.5 × $5.003 = $ 1,503.40
 ________
 1973 Earnings Total ........................................ $ 8,876.70
 ==========
 January 1April 30, 1974
 550.5 × $5.003 = $ 2,754.15
 May 1November 7, 1974
 656.25 × $5.153 = $ 3,381.66
 November 16December 28, 1974
 262.5 × $5.323 = $ 1,397.29
 ________
 1974 Earnings Total ........................................ $ 7,533.10
 ==========
 William LewisComparison Chart
Year Estimated Earnings Straight Time Actual Earnings Difference
1968 $ 3,530.92 $ 2,224.79 $ 1,306.13
1969 9,715.25 6,351.99 3,363.26
1970 10,114.45 6,875.04 3,239.41
1971 10,315.30 7,122.27 3,193.03
1972 10,656.84 7,546.42 3,110.42
1973 11,550.39 8,876.70 2,673.69
1974 9,777.63 7,533.10 2,244.53
 __________ __________ __________
TOTAL $65,660.78 $46,530.31 $19,130.47

Similar calculations for Tazewell Lewis are as follows:

 August 17November 9, 1968
 450 × $5.27 = $ 2,371.50
 November 16December 27, 1968
 271 × $5.27 = $ 1,428.17
 ________
 Estimated Earnings Total 1968 .............................. $ 3,799.67
 ==========
 January 1November 6, 1969
 1559.75 × $5.27 = $ 8,219.88
 November 7December 31, 1969
 270 × $5.27 = $ 1,422.90
 ________
 Estimated Earnings Total 1969 .............................. $ 9,642.78
 =========

*541
 January 1October 31, 1970
 1591.75 × $5.27 = $ 8,388.52
 ________
 Estimated Earnings Total 1970 .............................. $ 8,388.52
 ===========
Total Estimated Earnings 1968-1970 ............................. $21,830.97
===========================================================================
 Actual EarningsStraight Time Only
 August 17November 9, 1968
 450 × $3.12 = $ 1,404.00
 November 16December 27, 1968
 271 × $3.29 = $ 891.59
 ________
 1968 Earnings Total ........................................ $ 2,295.59
 =========
 January 1November 6, 1969
 1559.75 × $3.29 = $ 5,131.58
 November 7December 31, 1969
 270 × $3.42 = $ 923.40
 ________
 1969 Earnings Total ........................................ $ 6,054.98
 ==========
 January 1October 31, 1970
 1591.74 × $3.42 = $ 5,443.79
 _________
 1970 Earnings Total ........................................ $ 5,443.79
 ==========
 Tazewell LewisComparison Chart
 Year Estimated Earnings Straight Time Actual Earnings Difference
 1968 $ 3,799.67 $ 2,295.59 $1,504.08
 1969 9,642.78 6,054.98 3,587.80
 1970 8,388.52 5,443.79 2,944.73
 __________ __________ _________
 TOTAL $21,830.97 $13,794.36 $8,036.61

Back pay will be awarded the plaintiff in behalf of William Lewis in the amount of $19,130 and in behalf of the estate of Tazewell Lewis in the amount of $8,036.[8]
Having determined that the membership practices and procedures of the defendant have had a racially discriminatory effect in violation of Title VII, it remains for the court to decide upon the appropriate affirmative equitable relief, if any, which should be granted pursuant to the plaintiff's request. 42 U.S.C. § 2000e-5(g). Upon reflection, and after obtaining suggestions and comments from the parties, the court has elected to impose the following obligations and *542 duties upon the defendant by way of equitable relief:
1. Defendant will be required to offer unconditionally (subject to the payment of dues and other responsibilities of membership as are imposed uniformly upon all present or prospective members) to William A. L. Lewis immediate membership in Local 2P.
2. Defendants will be required to refer William A. L. Lewis to the next available journeyman position in a union shop for which he is or may become qualified. The seniority rights of William A. L. Lewis shall be computed by the defendant, under any collective bargaining agreement of the defendant to which the said William A. L. Lewis becomes subject, retroactively to the date of July 2, 1965, the effective date of the Act.
3. Defendant will be required to accept as its goal an increase in its membership so that its active journeyman and apprentice members together will reflect the 22% black work force in the Baltimore standard metropolitan statistical area, in pursuance of which goal the defendant will take at least the following affirmative steps:
a. No educational requirements for admission to the apprenticeship program shall be imposed by the defendant in addition to any such requirement imposed by the employer.
b. Defendant will publicize in predominantly black high schools and vocational-technical schools, and through the respective school systems as well as minority organizations and the media, the fact that its apprenticeship program is open to members of the black race.
c. Defendant will recruit blacks for its apprenticeship program. On the next four (4) occasions, when it is defendant's turn to designate an apprentice, it shall designate blacks so recruited. After that, defendant will redesignate one white and one black apprentice alternately, until the time when its active membership reflects the black work force in the Baltimore SMSA.
d. Defendant will reduce the period of apprenticeship to three years in order to qualify for journeyman status in the case of black apprentices to the extent it is within the power of the defendant, as opposed to that of the employer, to do so and absent a showing of business necessity for a longer period.
e. Defendant will eliminate its maximum age requirement of 25 in the case of all black applicants for its apprenticeship program.
f. Defendant will eliminate from its present apprenticeship waiting list all persons under 18 years of age, and will not in the future, place anyone on that list until that person shall have achieved his 18th birthday.
4. A semiannual review by the Equal Employment Opportunity Commission shall be conducted of the Affirmative Action Program herein ordered and the defendant shall furnish such records as are reasonably necessary to conduct such review. This review shall continue for at least five (5) years from the date of the final order to be entered herein, or until the defendant shall have reached or surpassed the goals herein set forth.

MEMORANDUM AND ORDER
Defendant has filed a Motion for Alteration of this court's Findings of Fact on the ground that the court's calculation of back pay for the period from August 17, 1968 to April 20, 1970 was based on speculation or factors not in evidence. As noted in its opinion, the court, in its discretion, resolved four of the uncertainties of back pay computation adversely to the plaintiff (i. e., used the day rate rather than the night rate as the standard of comparison; disregarded any overtime worked; eliminated an award of death benefits for Tazewell Lewis as well as fringe benefits for both the Lewis brothers; used the newspaper contract rate rather than the much higher gravure contract rate) while resolving one of the uncertainties of back pay *543 computation adversely to the defendant (i. e., used the 1970 union scale rate as a standard of comparison for the 1968-1970 period). In this latter case, demand was made upon the defendant for production of the contract which would have shown the actual 1968-1970 union scale rate, but said contract was not produced. The court believes that its resolution of the back pay computation is completely justified, if not mandated, by Hairston v. McLean Trucking Co., 520 F.2d 226 (4th Cir. 1975).
The plaintiff has moved this court to award its costs, exclusive of attorneys' fees. This court had no intention of denying plaintiff its costs. Under Rule 54(d), F.R.Civ.P., courts are authorized to allow costs "as of course to the prevailing party unless the court otherwise directs . . .." The court did not in this case otherwise direct. The awarding of costs to the EEOC is specifically permitted under 42 U.S.C. § 2000e-5(k). Costs will be computed and allowed by the Clerk as provided under 28 U.S.C. § 1920.
The plaintiff has also requested that prejudgment interest be imposed on the back pay awards. This court has previously held that in an appropriate case prejudgment interest may be awarded under Title VII. Chastang v. Flynn and Emrich Co., 381 F.Supp. 1348, 1352 (D.Md.1974). Prejudgment interest has been allowed on back pay computations in other cases. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Taylor v. Ford Motor Co., 392 F.Supp. 254 (W.D.Mo.1974); Equal Employment Opportunity Commission v. Liberty Mutual Insurance Co., 346 F.Supp. 675 (N.D.Ga.1972), aff'd 475 F.2d 579 (5th Cir. 1973); Weitkenaut v. Goodyear Tire & Rubber Co., 381 F.Supp. 1284 (D.Vt.1974). Under the circumstances of this case, the court is satisfied that prejudgment interest, calculated at 6% per annum simple interest, is part of the just compensation due to William Lewis and the Estate of Tazewell Lewis ". . . for the tangible economic loss resulting from an unlawful . . . practice." Robinson v. Lorillard Corporation, 444 F.2d 791 at 804 (4th Cir. 1971).
Accordingly, for the reasons set forth herein, the defendant's Motion for recalculation of the back pay award will be denied, and the Final Decree herein will provide for costs and prejudgment interest as set forth herein.

MEMORANDUM
In the process of preparing the Final Order in this case, a question has arisen as to whether or not the court should order the payment of back pay to be made by defendant within a certain specified period of time. Plaintiff, in a suggested Final Order, has requested the court to order that back pay be paid by the defendant within 15 days.
The authority, when exercised, which the court has under Title VII to grant back pay constitutes relief which is equitable in nature. Curtis v. Loether, 415 U.S. 189, 197, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260, 268 (1974); United States v. Long, 537 F.2d 1151 (No. 74-1398, 4th Cir.) (Oct. 28, 1975); EEOC v. Detroit Edison Co., 10 F.E.P. Cases 239 (6th Cir. 1975); Bowersox v. Georgia-Pacific Corp. (No. HM-74-1278, D.Md., Judge Murray) (Jan. 28, 1976). Section 706(g) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(g), authorizes the court to "order . . . affirmative action . . . which may include . . . back pay . . . or any other equitable relief as the court deems appropriate." (Emphasis added). Section 706(i) of the Act indicates that the statutory scheme contemplates possible noncompliance with a court's "order," and authorizes the EEOC to "commence proceedings to compel compliance with such order." Thus the Act itself provides that, in the event of noncompliance with the court's order, the plaintiff is authorized to seek compliance through proceedings traditionally used to enforce orders in equity. For these reasons, the court believes that it has the authority to order the defendant to make payment of the back pay award granted herein, for noncompliance with which order contempt and other proceedings might be instituted, *544 in addition to the more common practice of merely entering a judgment on the judgment records in favor of the plaintiff against the defendant.
In this case, however, while the court believes it is appropriate to enter an affirmative order that the defendant make payment of the back pay award as well as enter an order providing for a judgment to be entered on the judgment records, the court, at this time not being aware of the financial condition of the defendant or of other factors which might bear upon the time within which the back pay award could reasonably be made, declines to set forth in the Final Order a specific time within which the back pay must be paid. It is contemplated by the court that the back pay will be paid by the defendant within a reasonable time under all the circumstances. The exact parameters of the requirement of the Final Order to be entered herein that the defendant make payment of the back pay award to the plaintiff will have to be fleshed out in future compliance proceedings in the event the need arises.
NOTES
[1] Such a condition relating to employment was and is an unfair labor practice. 29 U.S.C. § 158(a)(3) and § 158(b)(2).
[2] Plaintiff's exhibit 40.
[3] Even if the United Papermakers and Paperworkers Local and the International had consented to the Lewis brothers resigning from their membership to join Local 2P for the purpose of conferring upon Local 2P the right to represent them in bargaining with the management of the Afro-American, the status of the employment of the Lewis brothers with the Afro-American might have been in jeopardy. The plaintiff introduced into evidence the contracts between the Afro-American and Local 111 of the United Papermakers and Paperworkers covering the period from November, 1967, through November, 1976 (PX 47-49). These contracts contained a provision that, as a condition of employment, all employees were required to remain members of Local 111. If such condition were a part of the contract covering the period prior to November, 1967, it is possible that the management of the Afro-American could have fired the Lewis brothers upon learning that they had resigned from Local 111 to join Local 2P.
[4] Plaintiff's exhibit 42.
[5] William Lewis's complaint stated that he had more than 25 years' experience whereas Tazewell Lewis's complaint stated that he had more than 20 years' experience.
[6] Although plaintiff has argued for an assessment of back pay based also upon overtime hours or night-rate hours worked by the Lewis brothers, there was no sufficient evidence to demonstrate that one working at the News American, the Sunpapers, or at a comparable job would have had a substantially similar number of overtime or night-rate hours as the Lewis brothers had at the Afro-American.
[7] The defendant, although demand was made upon it to produce the same, failed to furnish the plaintiff with the actual News American and Sunpapers contract for the period of August 17, 1968, through April 20, 1970. Since the defendant was a party to said contract, it presumably was within its power to have procured and produced it. As noted in the body of this opinion, the risk of uncertainty in calculating back pay rests upon the defendant. As well, the court has given the benefit to the defendant in its calculations of assuming that all of the estimated earnings of the Lewis brothers at union scale wage rates would have been at day rates rather than at the higher night rates. Under all the circumstances, the court has felt justified in assuming that the union scale wage rate of Local 2P for the period prior to April 20, 1970, was the same as that in effect under the contract which became effective on that date.
[8] Insufficient evidence having been introduced relative to the required contributions, if any, of members of Local 2P to funds necessary to pay death, pension, or other benefits, and the court not having sufficient information to calculate the actual loss to the Lewis brothers, if any, in those areas, no award is made for any such losses.