Charles KING, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent,**

**Duke Zeibert's Restaurant and Aetna
Casualty & Surety Company,
Intervenors.**

No. 88–164.

District of Columbia Court of Appeals.

Argued Jan. 10, 1989.
Decided June 22, 1989.

James Brewster Hopewell, Riverdale, Md., for petitioner.

Margaret D. Farthing, Fairfax, Va., for intervenors.

Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a statement in lieu of brief, for respondent.

Before NEWMAN and TERRY, Associate Judges, and KERN, Senior Judge.

TERRY, Associate Judge:

Petitioner, Charles King, sought workers' compensation benefits for a back injury which he allegedly suffered in the course of his employment. A hearing examiner in the Department of Employment Services denied his claim for further temporary total disability benefits after his original benefit payments had stopped, denied his request that an independent medical evaluation of the record be made, declined to keep the record open for the submission of an additional medical report, and refused to authorize payment of two bills or to approve back surgery on the ground that the bills and the requested surgery were the result of an unauthorized change of physicians. Despite the examiner's refusal to authorize the use of workers' compensation funds to pay for the requested surgery, the surgery was ultimately performed, and a copy of the hospital discharge summary was submitted to the Director of the Department of Employment Services before she rendered her final decision, which affirmed the ruling of the hearing examiner in all respects.

King challenges the Director's decision on several grounds, all of which are without merit except for his argument that the Director erred as a matter of law in failing to consider whether the hospital report should have been added to the record and, if so, whether a remand to the hearing examiner was appropriate in light of the report. Although we conclude that in this one respect the Director erred, we are nevertheless convinced that her decision would have been the same even if the report had been added to the record. Consequently, we "invoke the rule of prejudicial error," D.C.Code § 1–1510(b) (1981), and affirm the order under review.

I

On February 24, 1984, Charles King was working in the kitchen of Duke Zeibert's Restaurant in downtown Washington. As he ran to get some biscuits, he slipped in a small puddle of water on the kitchen floor and fell, landing on the right side of his back. He returned to work the following day but complained of lower back pain, particularly on his right side. Then began King's medical odyssey, a journey that eventually brought him to the office of Dr. Earl C. Mills. That visit in turn triggered the series of events which led to this litigation.

On February 29, five days after his fall, King was examined by Dr. Susan Ginsberg, who prescribed bed rest, heat applications, muscle relaxants, and anti-inflammatory drugs. King then returned to work at the restaurant, seeing Dr. Ginsberg once again in April. Several months later, in Novem-

ber 1984, King went to the emergency room at George Washington University Hospital, complaining that pain in his right side prevented him from finishing work that day. He was treated and released. King went back to see Dr. Ginsberg several times after that, but because she could not find a physical cause for his pain (an x-ray of his lumbosacral spine taken on December 5, 1984, was normal), she referred him to Dr. David Johnson, an orthopedic specialist.

In a report dated February 22, 1985, Dr. Johnson stated that King's spinal disc spaces were "well-maintained," with "no evidence of degenerative changes." The doctor nevertheless placed King in a physical therapy program at Greater Southeast Community Hospital. King also began to receive temporary total disability benefits.[1] When the physical therapy produced no improvement and a bone scan showed the spine to be "absolutely normal," [2] Dr. Johnson referred King to Dr. Norman Horwitz, who examined him on May 1, 1985. Dr. Horwitz likewise could not find a physical basis for King's complaints, so he recommended a computerized axial tomography (CAT) scan to determine whether there was a disc protrusion. Acting on Dr. Horwitz's recommendation, Dr. Johnson ordered a CAT scan of the lumbar spine, vertebrae L2 through S1, which was performed on May 14. In Dr. Johnson's opinion, the CAT scan revealed no abnormalities in King's spine and "no evidence of disc herniation." The doctor concluded that there was no medical reason why King could not return to work. At the same time, however, Dr. Johnson referred King to an orthopedic surgeon, Dr. Sam Wiesel.

Dr. Wiesel's examination also failed to turn up any objective findings to support King's subjective complaints. Dr. Wiesel ordered another CAT scan, which was run on June 25, 1985. This CAT scan showed a "completely normal" lumbo-sacral spine with no evidence of herniation at the L4–5 level, except for some minimal bulging. Finding nothing wrong, Dr. Wiesel referred King to Dr. David Borenstein, a rheumatologist, for further examination. Dr. Borenstein's examination of King, which included some neurological tests, revealed no abnormalities.

Because neither Dr. Borenstein nor Dr. Wiesel could find a medical cause for King's complaints, Dr. Wiesel referred King to Dr. Lorenz K.Y. Ng of the Washington Pain Center. In September and October 1985 King went to the Pain Center for physical and psychological testing. After reviewing the test results, Dr. Ng concluded that King was not a suitable candidate for the Pain Center's program because he seemed to lack the requisite motivation and because he displayed no impairment that would prevent his returning to work.

Apparently dissatisfied with these results, King consulted an attorney (not his present counsel), who gave him the telephone number of Dr. Earl C. Mills and suggested that King call Mills for an appointment. King did so and was examined twice by Dr. Mills, once in November and once in December 1985. After the first examination, Dr. Mills asked King to make an appointment for a magnetic resonance imaging (MRI) procedure.[3] The MRI report stated that there were "[b]ulging lumbar discs posteriorly ... with some minimal encroachment on the neural foramina at L4–5 and L5–S1." Dr. Mills reviewed the MRI report and, after examining King again, recommended a myelogram and another CAT scan, to be followed by surgery

---

1. King did not seek workers' compensation benefits until almost a year after his fall. The benefits he eventually received ran from February 9 through April 21, from April 27 through May 24, and from June 4 through August 20, 1985.

2. After reviewing the results of the bone scan, Dr. Johnson issued a return-to-duty slip to King, indicating that he could resume his full duties as of April 22, 1985.

3. An MRI procedure uses nuclear magnetic resonance to measure the magnetic moment of atomic nuclei for the purpose of ascertaining the nature of the covalent chemical bonds. *See* 2 J. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER M–11 (1986); 3 *id.* at N–92.

for removal of the herniated disc at the L4–5 level.

Because King's temporary total disability benefits had stopped in August 1985, he requested a hearing to establish his eligibility for further benefits. At the hearing, besides seeking additional benefits, King asked that the bill from Dr. Mills and the bill for the MRI procedure be paid by workers' compensation and that the surgery recommended by Dr. Mills be authorized.[4] The examiner denied all of these requests.

In reaching his decision, the examiner weighed the medical findings of Drs. Ginsberg, Johnson, Wiesel, Horwitz, Borenstein, and Ng against the lone opinion of Dr. Mills—an opinion which, in the examiner's view, was indecisive and entitled to "little weight." The examiner also weighed the results of the diagnostic tests ordered by these six physicians against the results of the one test ordered by Dr. Mills and concluded that King was not then suffering from any medical condition resulting from his fall in the kitchen of the restaurant. Accordingly, he denied King's request for temporary total disability benefits after August 20, 1985, and refused to authorize the surgery recommended by Dr. Mills. The examiner also concluded that King's visit to Dr. Mills was an unauthorized change of physicians, and therefore he refused to approve payment of either Dr. Mills' bill or the MRI bill, although Dr. Mills' reports and the MRI report were made a part of the record.

Mr. King took an administrative appeal to the Director of the Department of Employment Services, arguing that the hearing examiner had erred in refusing to keep the record open for an additional report from Dr. Mills, that the examiner should have sought an impartial medical evaluation of the MRI report, and that the examiner might have had the appearance of a conflict of interest. In August 1987, while his appeal was pending before the Director, Mr. King underwent a decompressive lumbar laminectomy at District of Columbia General Hospital. King sent a copy of the hospital discharge summary to the Director with a request that it be included in the record as additional medical evidence in support of his claim. The Director refused to consider the hospital report and affirmed the hearing examiner's order in all respects.

In this court King makes the same arguments he made before the Director, with one exception.[5] He also argues that the Director erred in not allowing him to supplement the record with the hospital discharge summary. Finally, he contends that the denial of his claim is not supported by substantial evidence.

## II

The District of Columbia Workers' Compensation Act provides that "[t]he Mayor shall appoint a panel of physicians to provide medical care ... to injured employees." D.C.Code § 36–307(b)(1) (1988). The Mayor has delegated his functions under the Act to the Director of the Department of Employment Services,[6] and the Director in turn has issued regulations governing how physicians' services are to be furnished and how workers' compensation proceedings are to be conducted. Under these regulations, an injured employee has the right to choose a treating physician from an approved panel of physicians, 7 DCMR § 212.2 (1986) (formerly Rule 3613.2, 29 D.C.Reg. 5548 (1982)),[7] or the employer

---

4. Dr. Mills' total bill was $340; the MRI bill was $1475. Aetna Casualty and Surety Company, the employer's insurance carrier, had refused to pay these bills on the ground that the services were unauthorized.

5. The conflict-of-interest allegation, which was dismissed by the Director as frivolous and unsubstantiated, is not renewed here.

6. Mayor's Order No. 82–126, 29 D.C.Reg. 2843 (1982).

7. Mr. King's injury occurred and the medical reports were written before the publication in 1986 of Title 7 of the District of Columbia Municipal Regulations (DCMR), but the hearing took place and the Director's decision was rendered after publication. Therefore, while we would ordinarily refer to the pertinent regulations only by their DCMR citations, in this case we will also provide parallel citations to the earlier Rules as published in the District of Columbia Register.

may select a physician from the panel if the employee is unable to do so because of injury. 7 DCMR § 212.3 (1986) (formerly Rule 3613.3, 29 D.C. Reg. 5548). Once a physician from the panel is selected, however, "an injured employee shall not change from one physician to another ... without authorization of the insurer." 7 DCMR § 212.13 (1986) (formerly Rule 3613.13, 29 D.C. Reg. 5549). Moreover, if an employee is dissatisfied with the medical care being received, he or she must submit a request for change of physicians to the Private Sector Branch of the Office of Workers' Compensation, which may approve a change of physicians if it deems a change to be in the best interest of the employee. 7 DCMR § 212.14 (1986) (formerly Rule 3614.14, 29 D.C. Reg. 5549). Mr. King plainly did not follow these regulations.

■ There is no evidence that Dr. Mills was an authorized physician under the Act, *i.e.*, a member of the approved panel of physicians. If Dr. Mills was not a panel member, Mr. King could have requested that he be specially appointed to the physicians' panel. *See* 7 DCMR § 213.9 (1986) (formerly Rule 3614.8, 29 D.C. Reg. 5551). Even if Mills was an authorized physician, King was nevertheless required to seek approval, either from the insurer or from the Office of Workers' Compensation, before he changed from Dr. Johnson to Dr. Mills.[8] *See* 7 DCMR §§ 212.13–212.14 (1986), formerly Rules 3613.13 & 3613.14, 29 D.C. Reg. 5549). Thus King's visit to Dr. Mills was either a consultation with an unauthorized, non-panel physician or an unauthorized change of physicians. In either event, neither Dr.

Mills' bill nor the bill for the MRI procedure ordered by Dr. Mills nor the cost of the surgery recommended by Dr. Mills could be paid by workers' compensation.

■ King also contends that the hearing examiner erred in refusing to hold the record open for some sort of follow-up report from Dr. Mills. At the hearing King stated that, in his lay view and in the view of most physicians, magnetic resonance imaging is a very sophisticated diagnostic technique, and that if the hearing examiner had any doubts on that score, the record should be kept open for the limited purpose of having Dr. Mills submit a statement to that effect.[9]

■ Once a workers' compensation hearing is concluded, no additional information may be submitted "except under unusual circumstances," D.C.Code § 36–320(c) (1988), *e.g.*, the submission of the results of an independent medical examination. *See Porter v. District of Columbia Department of Employment Services*, 518 A.2d 1020, 1023 (D.C.1986). In the case at bar, King proposed holding the record open only for a statement from Dr. Mills explaining what he thought about magnetic resonance imaging and why he selected it in this instance. Since Dr. Mills had previously explained why he ordered the MRI examination in his report of November 18, 1985 —a report that was already part of the record[10]—we conclude that there were no "unusual circumstances" to justify keeping the record open. It follows that the examiner's decision to close the record was not "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." D.C.Code § 1–1510(a)(3)(A) (1981); *see Lee v. District of Columbia*

---

8. Admittedly, Mr. King saw Dr. Mills on his attorney's advice, but that does not alter the fact that this change of doctors was contrary to the regulations. What is more, Dr. Johnson told King in May 1985 that if he felt he was unable to return to work, "he should seek the advice of [his employer's] personnel director, concerning another orthopedic surgeon for a second opinion."

9. King also argued that the record should be kept open in order to admit evidence that his employer's insurance carrier refused to authorize the surgery recommended by Dr. Mills.

Because the insurer did not dispute this, there was no reason to keep the record open for that purpose.

10. Dr. Mills stated in his report that all other tests, including the tests he performed, were negative or "unremarkable," but that Mr. King still complained of constant pain, with occasional numbness or stiffness. Given King's complaints, Dr. Mills decided to refer him for an MRI test and to "reevaluate him following the test."

*Department of Employment Services*, 509 A.2d 100, 102 (D.C.1986). For the same reason, it was neither arbitrary, capricious, nor an abuse of discretion for the Director to refuse to order the hearing examiner to reopen the record for receipt of an additional report from Dr. Mills.[11]

### III

██ King next argues that the hearing examiner's denial of his claim for benefits beyond August 20, 1985, and the Director's affirmance of that denial were not supported by substantial evidence. In considering an appeal from the decision of a hearing examiner in a workers' compensation case, the Director may not consider the evidence *de novo* and make her own findings of fact, but instead must conduct a limited review to determine whether the examiner's findings are supported by substantial evidence. *Dell v. Department of Employment Services*, 499 A.2d 102, 106–107 (D.C.1985). This court likewise is limited to determining whether the Director's order is in accordance with law and supported by substantial evidence in the record. *Joyner v. District of Columbia Department of Employment Services*, 502 A.2d 1027, 1029 (D.C.1986); *see* D.C.Code § 1–1510(a)(3)(A), (E) (1981), made applicable by D.C.Code § 36–322(b)(3) (1988). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) (citations omitted). We hold that the hear-

ing examiner's factual finding that King's disability did not extend beyond August 20 was amply supported by substantial evidence in the record.

Dr. Ginsberg, the physician who first treated King, found no physical basis for his complaint of back pain. An x-ray showed his spine to be normal. Dr. Johnson found no evidence of damage to King's spinal discs. Dr. Horwitz and Dr. Wiesel concurred in that opinion. A bone scan and two CAT scans of the lumbar spine showed no evidence of spinal abnormality or disc herniation. Dr. Borenstein, who conducted neurological tests, and Dr. Ng, who ran other physical tests plus a series of psychological tests, both independently concluded that there was no underlying physical cause for King's complaints. The MRI procedure ordered by Dr. Mills was the only test that detected a possible physical cause, but even the MRI report indicated at most a "minimal encroachment" of a disc on a nerve.[12]

Neither the Director nor this court may substitute itself for the trier of fact who received and weighed the evidence and who heard and saw the claimant. *Porter, supra*, 518 A.2d at 1022; *see Dell, supra*, 499 A.2d at 106 (hearing examiner's decision is entitled to special weight when examiner "has heard live testimony and observed the demeanor of the witnesses"). In this case the hearing examiner not only had the physicians' reports, the hospital reports, and the test results before him, but also heard direct testimony from Mr. King. We readily conclude that the denial of King's claim for further benefits was based on substan-

---

**11.** King also argues that the hearing examiner acted contrary to law in not seeking an independent evaluation of the medical reports in the record before the record was closed, and that the Director was wrong in concluding that an examiner is not authorized under the regulations to order such an evaluation. This argument has no merit.

The Office of Workers' Compensation may require an injured employee "to submit to physical *examinations* at times and places reasonably convenient for the employee." 7 DCMR § 212.17 (1986) (formerly Rule 3613.17, 29 D.C. Reg. 5550) (emphasis added); *see* D.C.Code § 36–320(f) (1988). In this case, however, King merely asked the hearing examiner to schedule

an *evaluation* of the existing medical records by a physician who had not previously seen him. A medical evaluation of a record is clearly not a medical examination of an employee. The Director was therefore correct in concluding that a hearing examiner is without authority to send the record to a non-treating physician for the sole purpose of obtaining an independent evaluation of an injured employee's condition.

**12.** Evidence of minimal bulging in that area of the spine had been detected by the two earlier CAT scans, but because there appeared to be no herniation or other abnormality, Drs. Johnson and Wiesel concluded that surgery was not necessary.

tial evidence. *See Porter, supra,* 518 A.2d at 1021–1022.

## IV

 Before the Director rendered her decision, King requested her to add the discharge summary from District of Columbia General Hospital to the record as additional medical evidence in support of his claim. Once King made the request, the Director was obligated by statute to consider whether this proffered evidence was material and whether "there were reasonable grounds for the failure to adduce such evidence in the initial hearing...." D.C.Code § 36–322(b)(2) (1988).[13] Instead of complying with the statute and its implementing regulations, 7 DCMR §§ 230.5 and 230.6 (1986),[14] the Director simply ignored the report.[15] We hold that this was error, but we conclude that the error was harmless.

 It is obvious that reasonable grounds existed for not introducing the hospital report at the initial hearing: the surgery was not performed, or even scheduled, until after the hearing had concluded and the record had been closed. Nor can there be any serious dispute about materiality. The questions of whether King had a herniated disc, what might have caused it, and whether he was prevented from resuming employment because of a work-related back injury were clearly material to his claim for compensation. *See Davis v. District of Columbia Department of Employment Services,* 542 A.2d 815, 820 (D.C. 1988). The hospital report bore directly on these issues; therefore, it was material evidence.[16] If our analysis ended here, we would be required to reverse and remand. *See Jones v. District of Columbia Department of Employment Services,* 553 A.2d 645, 647 (D.C.1989); *Thomas v. District of Columbia Department of Labor,* 409 A.2d 164, 169 (D.C.1979). But our analysis does not end here.

When reviewing administrative decisions like the one at bar, this court "may invoke the rule of prejudicial error." D.C.Code § 1–1510(b) (1981). Under that "rule," which is really another way of saying that we may find an error harmless, "reversal and remand [are] required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed." *Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146 (D.C.1983) (citations omitted); *accord, e.g., LCP, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 499 A.2d 897, 903–905 (D.C.1985); *Vann v. District of Columbia Board of Funeral Directors and Embalmers,* 480 A.2d 688, 698 (D.C.1984). In the instant case, we are fully satisfied that even if the Director had added the hospital report to

13. D.C.Code § 36–322(b)(2) provides in pertinent part:

> The findings of fact in the order under review shall be conclusive if supported by substantial evidence in the record, considered as a whole. A case may be remanded for further appropriate action. If any party shall apply to the Mayor for leave to adduce additional evidence and shall show to the satisfaction of the Mayor *that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the initial hearing* before the Mayor, the Mayor may order such additional evidence to be taken and to be made a part of the record. The Mayor may modify his findings with respect to questions of fact, if supported by substantial evidence on the record considered as a whole. The Mayor may modify or set aside his original order by reason of such modified or new findings of fact. [Emphasis added.]

14. Unlike other regulations we have cited in this opinion (see note 7, *supra* ), these regulations did not exist before 1986. Consequently, there is no parallel citation.

15. In her decision the Director cited 7 DCMR § 223.4 (formerly Rule 2624.3, 29 D.C.Reg. 5563) for the proposition that "the Director can only consider and review the record below.... New evidence clearly cannot be considered by the Director on appeal." That regulation is inapplicable, however, because it refers only to the hearing examiner's responsibility with respect to new evidence, not to the duties of the Director reviewing the hearing examiner's decision.

16. Although the decision whether additional evidence is material rests initially with the Director, this court may also make a finding of materiality with respect to evidence in workers' compensation cases. *See* D.C.Code § 36–322(b)(3) (1988).

the record and remanded the augmented record to the hearing examiner, the ultimate finding—that King was not suffering from any work-related disability—would have been the same.

We arrive at this conclusion because the preoperative myelogram described in the hospital discharge summary showed evidence of a "very small" herniated disc at the L3 through L5 level. The CAT scan ordered by Dr. Wiesel and the MRI procedure ordered by Dr. Mills also showed some minimal bulging in this area of the spine. The reports of both these tests were in the record and were considered by the hearing examiner; thus the notation on the hospital report would add no new evidence to the case. It is of even greater significance that during the actual operation the surgeon found absolutely no evidence of disc herniation, even after a careful surgical inspection of the right side of the spine—the side allegedly affected by King's fall in the restaurant. The surgeon's report stated:

> The discs at L4, L5 and L3, L4 were then carefully inspected, especially on the right side, and noted that there was no evidence of any herniation at that point. After de-roofing the canal and evaluating that the discs were not herniating, the incision was then closed.

Thus we can say with substantial certitude that the hearing examiner would have made the same "ultimate finding," and that the Director would have been obliged to affirm it, even "with the error removed." *Arthur, supra*, 459 A.2d at 146.

The decision under review is accordingly

*Affirmed.*