**CHILDREN'S DEFENSE FUND, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.**

**Pamela Cary, Intervenor.**

**No. 96–AA–1928**

District of Columbia Court of Appeals.

Argued Oct. 21, 1997.

Decided April 8, 1999.

---

Hadrian R. Katz, Washington, DC, for petitioner. Erica Frohman Plave, entered an appearance for petitioner.

David A. Schiller, for intervenor.

Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy

Corporation Counsel, filed a statement in lieu of brief for respondent.

Before WAGNER, Chief Judge, and TERRY and FARRELL, Associate Judges.

TERRY, Associate Judge:

Children's Defense Fund ("CDF") seeks review of a decision of the Department of Employment Services ("DOES") which held that CDF had discharged Pamela Cary from employment in retaliation for her filing a workers' compensation claim. The Director of DOES ordered CDF to reinstate Ms. Cary to her former position and awarded her back pay. CDF argues that the agency's decision was erroneous because Ms. Cary did not prove either that CDF's decision to let her go was motivated by animus toward her or that the stated reason for her termination, namely, a staff reorganization, was actually a pretext for retaliatory discharge. We agree and reverse.[1]

I

A. *Factual Background*

CDF is a non-profit organization employing more than 150 people in clerical, administrative, and professional positions in Washington, D.C., and other cities throughout the nation. Ms. Cary is a high school graduate with some college credits in computer science, English, and mathematics. She has also had formal training in bookkeeping and the use of Lotus software.

On March 1, 1982, Ms. Cary was hired by CDF as a secretary for its Executive Director. Her duties included typing, answering telephones, taking minutes of board meetings, setting up files, and making travel arrangements. During her eleven-year tenure at CDF, Ms. Cary made several lateral moves as a secretary and also received two promotions, first to administrative assistant and then to senior administrative assistant in the Finance and Administration Division.

She regularly received good performance evaluations and was never placed on probation for any reason.

On April 16, 1992, while packing and moving some boxes at her office, Ms. Cary injured her back. About two weeks later she was examined by a doctor, who recommended that she take some time off from work to recuperate. Sometime in early May Ms. Cary told Michelle Hannahs, the Director of the Finance and Administration Division, for whom she was primarily working at the time, about her injury and asked whether she might be entitled to workers' compensation. This was the first time that Ms. Cary had reported her injury to anyone at CDF. Since the position of Director of Administration was vacant at the time, Ms. Hannahs asked Ms. Cary to wait until that position was filled before preparing the necessary papers. Accordingly, in early June, Ms. Cary reported her injury to Carmen Ford, the newly hired Director of Administration. The paperwork in support of her workers' compensation claim was completed sometime in August.

During the months following her injury, Ms. Cary missed work on several occasions for periods of a week or more, and in September she went on extended leave because of her injury. Ms. Hannahs, meanwhile, left CDF in August.[2] In October Ms. Cary received a letter from Ms. Ford asking when she expected to return to work, but Ms. Cary could not provide a return date at that time. In early November Ms. Ford telephoned Ms. Cary at home and asked her to come back to work because Reynald LaTortue, Ms. Hannahs' successor, would be coming on duty very soon and would need an assistant. Ms. Cary told Ms. Ford that she had not yet been cleared by her doctor and thus could not return to work.

On November 12, at the request of the Executive Assistant to the President of CDF, Ms. Cary met with Mr. LaTortue to discuss

---

1. CDF also argues that it was prejudiced because the compensation order was issued twenty months after the hearing by an examiner other than the one who heard the evidence. Since we decide the case on other grounds, we need not address this argument.

2. Since Ms. Cary worked mainly for the Director of the Finance and Administration Division—*i.e.*, Ms. Hannahs—there was not much work for her to do while that position was vacant.

the fact that she had exhausted her sick leave. Following their conversation, Mr. La-Tortue gave Ms. Cary a letter from Ms. Ford stating that she was being placed on leave without pay. The letter also told her that her workers' compensation claim had been denied for lack of certain medical data and asked her to provide the insurance carrier with the needed information. On December 8, 1992, Ms. Cary received another letter from Ms. Ford stating that the insurance carrier still had not received the necessary medical data and that her continued refusal to submit it would result in disciplinary action. Some time thereafter, however, the insurance carrier obtained the needed information, and Ms. Cary received benefits retroactive to November. On January 19, 1993, Ms. Cary's treating physician advised her that she could return to work on January 29; however, she waited until February 9 to tell this to CDF.

On February 11 Ms. Cary received a letter from Ms. Ford informing her that, because of a restructuring of the Finance and Administration Division, her job was being eliminated. Consequently, the letter said, her employment was terminated, but she was welcome to apply for the newly created position of Finance and Administration Associate. Ms. Cary never applied for the new position, nor did she even make any inquiries about it. When asked at the DOES hearing why she had not done so, she replied, "If they wanted me there, they wouldn't have fired me in the first place."

The restructuring of the Finance and Administration Division was the result of two months of discussions among Mr. LaTortue, Ms. Ford, and others, including the President of CDF. Mr. LaTortue wanted to strengthen administrative support in the areas of grant disbursement and financial management. As part of this reorganization, three positions were eliminated: those of John Bergstrom, Serena Adams, and Pamela Cary. Ms. Cary's position was abolished because Mr. LaTortue needed help of a different type from that which Ms. Cary could provide and had previously provided to his predecessor, Ms. Hannahs. That is, rather than secretarial-type work, most of which he did for himself, Mr. LaTortue needed assistance with budget reviews, analysis of financial data, and preparation of spread sheets. In addition, to make it possible to do more of CDF's accounting work in-house, he wanted an assistant with an accounting background.

On February 15, 1993, CDF published a notice seeking applicants for the newly created position of Finance and Administration Associate. The announcement of the new position was posted on bulletin boards throughout CDF's offices, and an ad was placed in the Washington Post. Ms. Cary admittedly did not have the qualifications listed for this position. Specifically, she lacked experience in developing spread sheet models, she had not regularly worked in an accounting or financial environment, and she did not have a college degree.

### B. The Administrative Proceedings

In December 1993 Ms. Cary filed with DOES a claim of retaliatory discharge under D.C.Code § 36–342 (1997).[3] On June 30, 1994, an evidentiary hearing was held at which Ms. Cary and Mr. LaTortue testified. After some delay resulting from the resignation of the original hearing examiner (see note 1, *supra*), a second examiner issued a compensation order granting Ms. Cary's claim for benefits. The pertinent findings of fact included the following:

The parties stipulated, and I find, that ... there was an accidental injury on April 16, 1992, which arose out of and in the course of claimant's employment; ... that the insurer, ITT Hartford, paid temporary total disability benefits from November 16, 1992, to February 7, 1993 ...; that claimant was released to return to her regular employment duties by her doctor, Dr. Azer, on January 29, 1993; and that claimant received a certified letter, dated Feb-

---

3. Section 36–342 provides in part:
 It shall be unlawful for any employer ... to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or at-

tempted to claim [workers'] compensation from such employer, or because he has testified or is about to testify in a proceeding under this chapter [the Workers' Compensation Act].

ruary 8, 1993, notifying her that her Senior Administrative position would be terminated on February 23, 1993.

I find that claimant was hired by employer herein as a secretary on March 1, 1982, and subsequently received two promotions with salary increases; on April 16, 1992, she was a Senior Administrative Assistant, whose job duties included secretarial responsibilities. I find that after she was hired by employer, employer paid claimant's tuition for a computer science course at the University of the District of Columbia (UDC), as well as the cost of Lotus training and other computer courses.

I find that ... employer's First Report of Injury was filed on August 13, 1992.... I find that claimant stopped working in September of 1992, and continued to use sick leave.

I find that on October 14, 1992, Carmen Ford ... wrote claimant to request a physician's statement and projected return to work date. I find that in October of 1992 Ms. Ford telephoned claimant at home to ask her to return to work to assist Mr. LaTortue when he came on board in two days. I find that claimant advised Ms. Ford that she would not be able to do so because she was still under doctor's care. I find that on October 19, 1992, employer hired a temporary replacement to perform claimant's usual work duties....

I find that on November 12, 1992, claimant met with Reynald LaTortue ... [and he] suggested that she apply for short term disability benefits to avoid being placed on leave without pay. I find that claimant refused to follow this suggestion because her injury was work-related and employer's short-term disability coverage did not include benefits for work-related injuries. I find that on that day claimant refused to speak with Ms. Ford about her work status because claimant believed Ms. Ford had spoken to her in a "nasty" tone of voice during their earlier telephone conversation....

I find that in November of 1992 Reynald LaTortue ... decided to implement a reorganization of positions. I find that the three employees to be affected by this reorganization were John Bergstrom ... Serena Adams ... and claimant. I find that the decision to terminate claimant was made by Mr. LaTortue on or before January 13, 1993....

I find that as part of the reorganization, Mr. LaTortue created a new job position, "Administrative Associate," to replace claimant's Senior Administrative Assistant position. I find that this new position included additional requirements of at least one year's experience in creating financial spreadsheets, using Lotus and Reportwriter software, and preparing basic financial reports. I find claimant did not meet the qualifications of the new, restructured "Administrative Associate" position. I find that on February 9, 1993, prior to receiving her termination letter from employer, claimant left a voice mail message with Mr. LaTortue's office stating that she was ready to come back to work.

... I find that although claimant's February 8, 1993, termination letter indicated that she was welcome to apply for the new position the employer created, she was never given a copy of the February 15, 1993, job announcement. I find that at the time claimant was terminated, employer had not started its active recruitment to fill the new position. I find that claimant's temporary replacement continued to perform her work duties until March of 1993. I find that employer's stated reason for termination of claimant's employment was pretextual.[4]

The examiner held that Ms. Cary had made a *prima facie* showing of retaliation by establishing that CDF had terminated her "without allowing her the opportunity to return to her usual work duties." In addition, the examiner concluded that CDF had failed "to show a legitimate business justification for the termination of [Ms. Cary's] employment."

---

**4.** Although this last sentence appears under the heading "Findings of Fact," it is really a conclusion of law. *See Perkins v. District of Columbia*

*Dep't of Employment Services*, 482 A.2d 401, 403 (D.C.1984).

CDF took an administrative appeal to the Director of DOES, but the Director affirmed the examiner's order. The Director held that there was substantial evidence to support the examiner's conclusion that Ms. Cary had presented a *prima facie* case of retaliatory discharge. The Director ruled that "the minimum a claimant needs to show to present a prima facie case of retaliatory discharge is to be discharged within proximity of the time she filed a workers' compensation claim," although the Director failed to state when the claim was actually filed or how close its filing was to Ms. Cary's termination. The Director also said that Ms. Cary had met her burden by showing that she "began to receive very negative communications" after losing time as a result of her injury. Finally, the Director held that there was sufficient evidence to support the examiner's finding that the restructuring was pretextual.

## II

In deciding an appeal from the decision of a hearing examiner, the Director of DOES may not consider the evidence *de novo.* Rather, the Director "must conduct a limited review to determine whether the examiner's findings are supported by substantial evidence." *King v. District of Columbia Dep't of Employment Services,* 560 A.2d 1067, 1072 (D.C.1989) (citing *Dell v. Dep't of Employment Services,* 499 A.2d 102, 106–107 (D.C.1985)). "This court likewise is limited to determining whether the Director's order is in accordance with the law and supported by substantial evidence in the record." *King,* 560 A.2d at 1072 (citations omitted). We will not disturb an agency decision if it rationally flows from the factual findings on which it is based and if those findings are supported by substantial evidence. *Becker v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 518 A.2d 93, 94 (D.C. 1986); *Dunston v. District of Columbia Dep't of Employment Services,* 509 A.2d 109, 112 (D.C.1986). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)

(citations omitted); *accord, e.g., Washington Post Co. v. District Unemployment Compensation Board,* 377 A.2d 436, 439 (D.C.1977).

To establish a *prima facie* case of retaliatory discharge under D.C.Code § 36–342, Ms. Cary must prove, first, that she made a claim for workers' compensation, and second, that CDF discharged her in retaliation for that action. *St. Clair v. District of Columbia Dep't of Employment Services,* 658 A.2d 1040, 1042 (D.C.1995); *Abramson Associates, Inc. v. District of Columbia Dep't of Employment Services,* 596 A.2d 549, 552 (D.C.1991); *Lyles v. District of Columbia Dep't of Employment Services,* 572 A.2d 81, 83–84 (D.C.1990). CDF does not dispute that Ms. Cary filed a claim under the Workers' Compensation Act; it argues only that Ms. Cary failed to prove that she was discharged in retaliation for filing that claim.

"Ordinarily the prima facie case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as [its] motive." 6 ARTHUR LARSON *et al.,* LARSON'S WORKERS' COMPENSATION LAW § 68.36(c), at 13–318 (1993) (hereafter LARSON); *accord, e.g., Abramson Associates,* 596 A.2d at 553. It is not enough, however, for the employee merely to point to the fact that she has been discharged. *St. Clair,* 658 A.2d at 1043. To prove the necessary retaliatory animus, the employee must make some additional showing beyond the discharge, even when the discharge itself may have been unreasonable. *See, e.g., Lyles,* 572 A.2d at 84–85; *Dyson v. District of Columbia Dep't of Employment Services,* 566 A.2d 1065, 1066 n. 7 (D.C.1989). For example, a claimant may sustain her burden by showing that the employer has engaged in a similar pattern of discrimination against other employees, *Lyles,* 572 A.2d at 84, or by evidence that a supervisor uttered words such as "I'll teach you to file a workers' compensation claim." *Dyson,* 566 A.2d at 1066 n. 7; *see also* 6 LARSON § 68.36(c), at 13–318.

In this case the examiner, relying solely on her finding that CDF "terminated [Ms. Cary] without allowing her the opportu-

nity to return to her usual work duties," concluded that Ms. Cary had demonstrated animus and therefore established a *prima facie* case. This conclusion is contrary to the case law. *E.g., Lyles,* 572 A.2d at 84–85; *Dyson,* 566 A.2d at 1066 n. 7. "An administrative order can only be sustained on the grounds relied on by the agency." *Jones v. District of Columbia Dep't of Employment Services,* 519 A.2d 704, 709 (D.C.1987). Thus, since there was a legally insufficient basis for the examiner's conclusion that CDF's discharge of Ms. Cary was motivated by animus, the Director should not have upheld it.

In affirming the examiner's ruling, the Director cited *Abramson* and noted "that the minimum a claimant needs to show to present a prima facie case of retaliatory discharge is to be discharged within proximity of the time she filed a workers' compensation claim." This was error. To be sure, we recognized in *Abramson* that the " '[t]iming of the discharge in relation to other events will virtually always be a critical circumstance' " in proving the animus element of a retaliatory discharge. 596 A.2d at 553 (citations omitted). We did not suggest, however, that proximity in time was "the minimum a claimant needs to show" for a *prima facie* case; the Director erred in relying on *Abramson* for that proposition.[5] Indeed, such a reading of *Abramson* would eliminate the animus requirement altogether and would be inconsistent with our prior holdings. *E.g., St. Clair,* 658 A.2d at 1043; *Lyles,* 572 A.2d at 84; *Dyson,* 566 A.2d at 1066 n. 7. Therefore, since the Director's decision was founded on a misconception of the law, we cannot affirm it. *SEC v. Chenery Corp., supra* note 5, 318 U.S. at 94, 63 S.Ct. 454 ("an agency order may not stand if the agency has misconceived the law").

■■■ Once the employee has made a *prima facie* showing of retaliatory discharge, the burden of production shifts to the em-

ployer to articulate a legitimate, non-retaliatory reason for the discharge. *Abramson Associates,* 596 A.2d at 553; *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986). "The employer, however, need not persuade the court that it was actually motivated by the proffered reasons." *Abramson Associates,* 596 A.2d at 553 (citations omitted); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (burden of production does not involve any credibility assessment). Once the employer has met its burden of production, the employee must show not that the employer's stated reason is incredible, but that the employer unlawfully discharged the employee. *Id.* at 519, 113 S.Ct. 2742 (employee bears the ultimate burden of persuasion).

■■■ To meet its burden of production, CDF offered the testimony of Reynald LaTortue and Carmen Ford to show that Ms. Cary had been discharged for a legitimate business reason, namely, reorganization of the department for which Mr. LaTortue had recently assumed responsibility. Mr. LaTortue testified that he eliminated Ms. Cary's position because he needed a different type of assistance from that which she had provided to his predecessor. The evidence also showed that during the months prior to Ms. Cary's discharge, Mr. LaTortue discussed reorganization plans with other members of CDF's management team, and that CDF published announcements of the new position resulting from the reorganization. The qualifications for that position were different from those for Ms. Cary's previous job, and Ms. Cary admittedly did not meet them.

The examiner expressly found that Ms. Cary was terminated pursuant to a reorganization, but concluded nevertheless that CDF

---

5. Ms. Cary argues that the Director relied on proximity in time as one of several factors to be considered. This argument, however, completely disregards the Director's plain language. Since the Director's order can be upheld only on the grounds articulated by the Director, *see SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we cannot sustain it by reading into it something that is not there. *See Abramson Associates,* 596 A.2d at 554; *Long v. District of Columbia Dep't of Employment Services,* 570 A.2d 301, 302 (D.C.1990); *Jones,* 519 A.2d at 709.

failed to meet its burden of production. In an apparent effort to brush aside this *non sequitur*, the Director noted that "the Hearing Examiner did not rule against the employer because she found no business reason, but rather that the business reason was pretextual." Moreover, the Director stated, "even if the employer met its burden of production in producing a legitimate business reason for terminating claimant ... there was substantial evidence in the record for the Hearing Examiner to find it was pretextual." To support this statement, the Director relied on an internal CDF memorandum discussing the possible legal ramifications of discharging Ms. Cary and the fact that CDF had arranged for training for its entire staff in the computer skills that Ms. Cary needed to qualify for the new position.

But that memorandum does not provide substantial evidence that Ms. Cary was discharged in retaliation for exercising her rights under the Workers' Compensation Act, nor does it support the hearing examiner's finding that it "reflect[s] employer's creation of a pretextual 'restructuring' in order to replace claimant due to her extended disability status and successful pursuit of her workers' compensation claim." The pertinent part of the memorandum, sent by Ms. Ford to Mr. LaTortue, reads as follows:

1. The most immediate issue involves identifying the best strategy for hiring a permanent replacement for Pam Cary, given her present totally disabled status. You have stressed the criticality of filling her position, which I believe that we can do providing we hold a comparable position for her until she returns to work. Given Pam's present status, I feel that we must obtain legal advice concerning the best approach to take, ADA implications, etc.

2. Presently, Pam is pursuing a Workers' Compensation insurance claim, for which we have received an initial notice of controversion from Hartford. Though Pam did not initially follow up with Hartford upon receipt of the notice, her attorney (this week) supplied Hartford with her medical records and other information to expedite processing the claim. Once a final decision has been made regarding Pam's Workers' Compensation claim, I would like to have a general review of the legal implications of the options CDF will have to consider.

From this memorandum, no objective reader could fairly conclude that Ms. Cary was discharged in retaliation for filing a workers' compensation claim.

Indeed, the record as a whole does not contain substantial evidence to support the conclusion that CDF discharged Ms. Cary in contravention of D.C.Code § 36–342. *See Becker*, 518 A.2d at 94; *Dunston*, 509 A.2d at 112. The evidence shows (1) that Mr. LaTortue reorganized his department, (2) that this reorganization was discussed with other managers, including CDF's president, several months before Ms. Cary's discharge, (3) that as part of this reorganization two other employees were also discharged, (4) that a new position was created to replace the one previously held by Ms. Cary, (5) that CDF publicly announced the creation of this new position, (6) that Ms. Cary was not qualified for it, and (7) that Ms. Cary was invited to apply for it but chose not to do so. This final point is important. Given the admitted fact that Ms. Cary never applied for the new position although invited to do so, the fact that CDF later introduced training in the software skills that *might* have qualified her for the job has no evidentiary significance. Had she applied for the job and requested such training but been denied it, the fact that the employer later offered it to others might have been probative of motive. But that is not what happened. We hold, therefore, that the Director's conclusion that CDF unlawfully retaliated against Ms. Cary does not rationally flow from the established facts.

Ms. Cary argues that a letter threatening disciplinary action if she did not comply with CDF's request to furnish information necessary to complete her workers' compensation claim supports the Director's conclusion. She asserts that CDF sent this letter merely to create a paper trail "to superficially support a future pretextual discharge" and that the threat of disciplinary action showed a retaliatory motive. This contention, however, ignores the fact that Ms. Cary was in violation of company policy at the time, and

that her employer was therefore entitled to take appropriate measures to deal with that violation. *See Lyles,* 572 A.2d at 85 (section 36–342 does not protect an employee who is discharged for violating work rules); *Maness v. Star–Kist Foods, Inc.,* 7 F.3d 704, 708 (8th Cir.1993) (employer not liable under Title VII of the Civil Rights Act if employee would have been discharged even in the absence of protected activity), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 813 (1994).[6] "Discrimination works both ways and, while discrimination against employees who file compensation claims should not be countenanced, the allegation of discrimination should not become a sword without just cause." *Brewster v. C.H. Liebfried Mfg. Corp.,* 65 A.D.2d 162, 163, 411 N.Y.S.2d 413, 414 (1978); *cf. Lyles,* 572 A.2d at 84 (employer cannot be required to act as "a virtual guarantor of continued employment").

### III

The decision of the hearing examiner that CDF discharged Ms. Cary from employment in contravention of section 36–342 was not in accordance with the law, was not supported by substantial evidence, and does not rationally flow from the facts relied upon by the examiner. The decision of the Director upholding the examiner's ruling is therefore reversed, and the case is remanded to DOES for further proceedings consistent with this opinion.

*Reversed and remanded.*

WAGNER, Chief Judge, dissenting:

Although the hearing examiner relied upon an incorrect legal standard in determining

that the employer had discharged claimant in retaliation for filing a workers' compensation claim, the Director of the agency, upon review, applied the proper legal standard to the facts as found by the examiner and reached the same result. It is, of course, within the Director's province to review the examiner's conclusions of law *de novo,* as she did here, even though bound by the examiner's factual findings. *KOH Systems v. District of Columbia Dep't of Employment Servs.,* 683 A.2d 446, 449 (D.C.1996) (citations omitted). Since there is substantial evidence in the record to support the Director's decision, and it is consistent with applicable law, this court should not disturb it. *Lyles v. District of Columbia Dep't of Employment Servs.,* 572 A.2d 81, 84 (D.C.1990).

The hearing examiner's initial error, which the Director corrected in the final agency decision, was in concluding that claimant had established a *prima facie* case of retaliatory discharge by showing only that she made a claim for workers' compensation and that her employer terminated her "without allowing her the opportunity to return to her usual work duties...." The claimant must show that the employer's termination decision was motivated by *animus* against the employee, resulting wholly or partly from the employee's pursuit of rights under the Workers' Compensation Act, which entails some additional showing beyond the firing. *Lyles, supra,* 572 A.2d at 84 (citations omitted). Here, the Director in fact relied upon many more facts, as found by the examiner, in reaching the final decision.[1] Specifically, the Director relied upon the proximity of the time between the filing of the claim and the termination of the claimant's employment;[2]

6. There is no suggestion in the record that Ms. Cary's termination was a disciplinary matter; rather, the cited cases are meant to illustrate that CDF was justified in threatening disciplinary action.

1. Unlike the majority, I do not read the Director's decision as relying on an improper standard for proof of *animus.* While the Director stated erroneously that the bare minimum required to show a *prima facie* case is discharge within proximity to filing a workers' compensation claim, she added immediately that "[h]erein, the claimant has a much stronger case than the bare minimum" and then identified various other

circumstantial evidence supporting the finding of a *prima facie* case. *See, e.g., Abramson Assocs. v. District of Columbia Dep't of Employment Servs.,* 596 A.2d 549, 553 (D.C.1991); *Lyles, supra,* 572 A.2d at 84.

2. Contrary to the majority, I think that the examiner's factual findings, which the Director accepted, adequately show the proximity of the timing of the claim to the claimant's termination. According to the findings of the hearing examiner, the first report of injury was filed on August 13, 1992, and in September 1992, claimant went on leave for a work-related injury. Her claim for temporary total disability benefits was approved

an internal memo of the employer indicating that the employer was attempting to find a way to discharge the claimant because of her disability status which, nevertheless, would appear to be legal;[3] claimant's excellent evaluations,[4] employer-paid training and certificates of achievement during some ten years as contrasted with negative communications after she lost time from work due to her work-related injury. These factors provide additional circumstantial evidence of the requisite *animus* sufficient to shift the burden of production to the employer to rebut the inference of retaliation, as the Director concluded. *See Abramson, supra* note 1, 596 A.2d at 553 (citations omitted).

I cannot agree with the majority that the Director erred in concluding that there was sufficient evidence for the hearing examiner to conclude that the reorganization was pretextual.[5] There was evidence from which it could be concluded reasonably that the employer reorganized claimant out of a job purportedly because it needed someone with additional skills which claimant did not possess. In concluding that there was substantial evidence in the record from which the examiner could conclude that the termination was pretextual, the Director stated:

> The hearing examiner found that a few months after claimant was fired, the employer made arrangements for an outside consultant to come in and provide ongoing training to its entire staff in the software usage skills claimant was suppose[d] to have needed in order to perform the duties of her new, "restructured" position.... The hearing examiner also cited the confidential memo of December 9, 1992[6] to show that employer's alleged business reason was a pretext to fire claimant.... The other evidence the Hearing Examiner utilized to support her finding of retaliatory discharge gives added weight to her conclusion.

That other evidence, as set forth in the examiner's findings, included: (1) the absence of pressure to reduce staff; (2) the continuation of prior accounting practices after claimant was terminated, thereby showing that no new skills were actually required; (3) the failure of the supervisor to evaluate claimant's transferable skills; (4) the exclusion of other employees from the reorganization except for a temporary employee and an em-

on December 22, 1992 retroactive to November 16, 1992. She received temporary total disability benefits from November 16, 1992 to February 7, 1993. The Assistant Director of Finance and Administration for the employer made the decision to terminate claimant on or before January 13, 1993. On February 12, 1993, the claimant received a termination letter dated February 8, 1993, effective February 23, 1993. The timing of the discharge in relation to other events is critical circumstantial evidence in proving retaliatory discharge. *Abramson, supra*, 596 A.2d at 553 (citations omitted).

3. The memo, dated December 9, 1992, states in pertinent part:
 1. The most immediate issue involves identifying the *best strategy for hiring a permanent replacement for Pam Cary, given her present totally disabled status.* You have stressed the criticality of filling her position, which I believe that we can do providing we hold a comparable position for her until she returns to work. Given Pam's present status, I feel that we must obtain legal advice concerning the best approach to take, ADA implications, etc.
 2. Presently, Pam is pursuing a Workers' Compensation insurance claim, for which we have received an initial notice of controversion from Hartford. Though Pam did not initially

follow up with Hartford upon receipt of notice, her attorney (this week) supplied Hartford with her medical records and other information to expedite processing the claim. *Once a final decision has been made regarding Pam's Workers' Compensation claim, I would like to have a general review of the legal implications of the options CDF will have to consider.*

4. There was one exception.

5. The hearing examiner correctly stated that once the claimant establishes a *prima facie* case, the burden of production shifts to the employer to show a legitimate business justification for the termination of claimant's employment. *See Abramson, supra* note 1, 596 A.2d at 553. However, the examiner then appears to have held the employer to the burden of persuasion, which remains with the claimant. *See id.* at 553–54. The Director again remedied any error by applying the correct legal standard to the examiner's factual findings. The Director concluded that "even if the employer met its burden of production in producing a legitimate business reason for terminating claimant, the Director holds that there was substantial evidence in the record for the Hearing Examiner to find it was pretextual."

6. *See* note 3, *supra.*

ployee subject to termination for misconduct; and (5) the failure to apprise the employer's top administrator of the planned reorganization until after claimant was terminated. The hearing examiner could conclude reasonably from these facts, as she did, that the "employer's stated reason for terminating claimant's employment, i.e., its 'restructuring' justification, was pretextual[,]" even if we might have reached a different result from an independent review of the record. *See Dell v. Dep't of Employment Servs.*, 499 A.2d 102, 108 (D.C.1985).

Finally, I cannot agree with the majority that the claimant's failure to apply for the reconstituted position after her firing eliminates the evidentiary significance of the fact, as found by the hearing examiner, "that a few months after claimant was fired, the employer made arrangements for an outside consultant to come in and provide ongoing training to its entire staff in the software usage skills claimant was suppose to have needed in order to perform the duties of her new, 'restructured' position." The restructured position added the requirement for experience with spreadsheets using certain software which the employer knew that claimant did not possess. Since the new job description was written in such a way that claimant could not qualify, it would have been futile for her to apply. "The law does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. 56, 75, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *In re M.E.B.*, 638 A.2d 1123, 1129 (D.C.1993); *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 921 (D.C.1992); *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 232 (4th Cir.1975).[7] That the employer provided training after claim-

ant's firing which would have allowed her to perform the "new" job is relevant to show that restructuring the position was pretextual, particularly when considered with evidence showing an effort to devise a plan to fire her which would appear to be legal. Cases of retaliatory discharge are difficult to prove "because an employer rarely declares that retaliation is a motive for an employee's discharge, [therefore] the employee must ordinarily rely upon circumstantial evidence to prove retaliatory animus." *Abramson, supra* note 1, 596 A.2d at 553. To disregard the type of circumstantial evidence discussed here, erects yet another barrier to proving claims of retaliation and other acts of discrimination.

The agency's decision in this case is supported by substantial evidence and consistent with applicable law; therefore, we should affirm it. *See KOH, supra*, 683 A.2d at 449 (citations omitted). The mere existence of evidence to the contrary, even if substantial, does not permit this court to substitute its judgment for that of the agency. *Spevak v. District of Columbia Alcoholic Beverage Control Bd.*, 407 A.2d 549, 554 (D.C.1979) (citing *Schiffmann v. District of Columbia Alcoholic Beverage Control Bd.*, 302 A.2d 235, 238 (D.C.1973)). For the foregoing reasons, I respectfully dissent from the opinion of the court.

---

**7.** In *Hairston*, the district court denied back pay to some members of a class who were systematically discriminated against in employment because of race. *Hairston, supra*, 520 F.2d at 229. One reason for the district court's denial of back pay was because the plaintiffs involved had not sought promotion or transfer. *Id.* at 230. Since the employment practices and polices of the employer would have rendered an effort for promotion or transfer futile, the plaintiffs' failure to apply was not dispositive. *Id.* In reversing and remanding, the Fourth Circuit observed:

> If an employer can avoid back pay liability through a policy which makes an attempt to gain a better job risky or futile, then this subtle form of discrimination is encouraged, not dis-

couraged. Similarly, plaintiffs harmed by such policies—plaintiffs deterred by the futility or risk of seeking promotion—are denied an award which would "make them whole," not because they were not disadvantaged by discrimination, but merely because of the peculiar method by which discrimination was implemented.

*Id.* at 232 (footnote omitted). "In other areas of Title VII relief, the law does not require a futile act as a precondition of relief." *Id.* at 232 n. 2 (citing, *e.g.*, *United States v. Sheet Metal Workers International Ass'n, Local Union 36*, 416 F.2d 123, 127 (8th Cir.1969); *Bing v. Roadway Express, Inc.*, 485 F.2d 441 (5th Cir.1973)).