*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-1258

MELBA P. CLARIDAD, PETITIONER,

V.

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

HOWARD UNIVERSITY HOSPITAL, *et al.*, INTERVENORS.

On Petition for Review of an Order of the
District of Columbia
Compensation Review Board
(CRB-129-18)

(Submitted February 7, 2020       Decided June 4, 2020)

*David J. Kapson* was on the brief for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Stacy L. Anderson*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent.

*William H. Schladt* was on the brief for intervenor.

Before THOMPSON, MCLEESE, and DEAHL, *Associate Judges*.

THOMPSON, *Associate Judge*:   In August 2015, petitioner Melba P. Claridad injured her right arm while working as a surgical intensive care unit ("SICU") nurse at Howard University Hospital (the "Employer").   After a course of treatment and therapy, she applied for an award of workers' compensation permanent partial disability benefits.   She now challenges a November 6, 2018, decision by the District of Columbia Department of Employment Services ("DOES") Compensation Review Board ("CRB") upholding an August 30, 2018, Compensation Order of the DOES Administrative Hearings Division ("AHD") that awarded her benefits for a 10% impairment of her arm, instead of the 23% impairment award she sought.   For the following reasons, we affirm the CRB's decision.

## I.

An AHD Administrative Law Judge ("ALJ") held an evidentiary hearing on July 11, 2018, regarding petitioner's claim.   The testimony and documentary evidence established that in September 2015, petitioner began treatment with Dr. Robert Wilson, a board-certified orthopedic surgeon, and other physicians in his practice group. Dr. Wilson diagnosed petitioner with lateral epicondylitis, also known as "tennis elbow."   Petitioner remained under the care of Dr. Wilson for

approximately two years. His plan of care for petitioner included "grip strengthening."

The Employer requested that petitioner undergo an Independent Medical Examination ("IME") by orthopedic surgeon Dr. Marc Danziger. In his February 23, 2016, examination report, Dr. Danziger opined that petitioner suffered a right arm injury of tennis elbow related to the work incident. Dr. Danziger further opined that petitioner's grip strength was "nearly equal to the opposite side, only slightly decreased on the right vs. the left by 10%."

Petitioner could not return to work in the SICU because her treating physicians had given her a light-duty release that restricted her from lifting over fifty pounds. She returned to full-time work for the Employer in another position in January 2017. The most recent report from Dr. Wilson's practice (a June 8, 2017, report by Dr. Thomas Nguyen) stated that petitioner's symptoms were "improving" despite "intermittent episodes of mild right elbow problem[s]."

In December 2017, still complaining of pain in her right wrist and elbow, petitioner underwent another IME by Dr. Joel Fechter. Dr. Fechter diagnosed petitioner with a right elbow injury and made findings of "tenderness to the medial

and lateral epicondyles" and "pain with full range of motion and over the lateral aspect of the elbow with resisted wrist dorsiflexion and grip strength." Using a dynamometer to test petitioner's grip strength, Dr. Fechter found that petitioner had grip strength on the "right 8kg of force [and] on the left 12kg of force." Dr. Fechter opined that petitioner suffered from a 23% permanent partial impairment to the right arm, largely attributable to her diminished right-side grip strength.

On July 9, 2018, two days before the AHD evidentiary hearing and at the Employer's request, petitioner underwent a follow-up IME by Dr. Danziger. On the day of the hearing, Dr. Danziger's written report had not yet been received, and the Employer requested that it be accepted as a post-hearing submission. Over petitioner's objection, the ALJ ruled that the hearing record would be kept open for receipt of Dr. Danziger's supplemental report and petitioner's response thereto. The hearing itself was adjourned the same day.

In his supplemental report, Dr. Danziger opined that petitioner had made a "full and complete recovery from the work related injury," that she had "normal grip strength," and that there were "no significant symptoms that persist." He also opined that petitioner had "a total permanent partial impairment to her right upper extremity of 3%." In response, petitioner submitted a letter from Dr. Fetcher on

July 25, 2018, opining that Dr. Danziger's supplemental report did "not change any of the opinions in [his] report on [petitioner] from December 7, 2017."

During the hearing, petitioner testified that she was still experiencing "a little" pain in her right arm and elbow and still had problems with grip strength or grasping.

In the Compensation Order, the ALJ found that petitioner testified credibly. The ALJ also found that Dr. Danziger's opinion was more consistent with the notes of petitioner's treating physicians than was Dr. Fechter's opinion, given that the treating physician notes contain no reference to any weakness in petitioner's right extremity after October 1, 2015. The ALJ concluded that petitioner suffers from permanent partial impairment disability in her right elbow and right forearm and approved a 10% permanent partial disability award.[1]

The CRB affirmed. It found that substantial evidence supported the ALJ's conclusion that Dr. Danziger's opinion was more persuasive than Dr. Fetcher's opinion. The CRB also found that the ALJ did not err or abuse discretion by

---

[1] The ALJ explained the award as "3% based on Dr. Fechter's ratings for her subjective complaints, plus an additional 4% for her pain, and an additional 3% for loss of endurance, for a total permanent partial disability of 10%."

keeping the record open for admission of Dr. Danziger's IME report. The CRB distinguished D.C. Code § 32-1520(c) (2019 Repl.) and this court's case law prohibiting the acceptance of post-hearing information except in unusual circumstances on the ground that the ALJ did not re-open the record for Dr. Danziger's supplemental IME evaluation, but instead kept the record open for both the supplemental medical report and petitioner's response, a course that the CRB determined was proper under the statute even in the absence of unusual circumstances. The CRB also reasoned that under § 32-1520(g), all relevant and material medical reports must be received into the record.

## II.

"Our limited role in reviewing [a] decision of the CRB permits us to reverse only if we conclude that the decision was arbitrary, capricious, or otherwise an abuse of discretion and not in accordance with the law." *Johnson v. District of Columbia Dep't of Emp't Servs.*, 167 A.3d 1237, 1240 (D.C. 2017) (internal quotation marks omitted). Although we review the CRB's decision, "we cannot ignore the compensation order which is the subject of the CRB's review." *Placido v. District of Columbia Dep't of Emp't Servs.*, 92 A.3d 323, 326 (D.C. 2014) (internal quotation marks omitted). This court will not disturb a decision of the

CRB "if that decision flows rationally from findings of fact that are supported by substantial evidence." *Johnson*, 167 A.3d at 1240 (internal quotation marks omitted).

In her petition for review, petitioner contends that admitting Dr. Danziger's post-hearing medical report contravened § 32-1520(c), because there were no "unusual circumstances" that justified doing so.[2] She also argues that the ALJ's reliance on Dr. Danziger's opinion of her "normal grip strength" was improper since Dr. Danziger did not specify what tests were performed in order to reach his conclusion.

## III.

D.C. Code § 32-1520(c) provides that "[n]o additional information shall be submitted by the claimant or other interested parties after the date of hearing, except under unusual circumstances[.]" *See also Johnson*, 167 A.3d at 1241 ("[A] post-hearing reopening of the record was permissible in this case only if there were unusual circumstances permitting such reopening."); *Jones v. District of Columbia*

---

[2] We note that petitioner presses this claim even though her counsel made his own post-hearing submission: a portion of the AMA Guides to the Evaluation of Impairment, Fifth Edition.

*Dep't of Emp't Servs.*, 584 A.2d 17, 20 (D.C. 1990) ("*Jones II*") (construing the identical predecessor statute). We acknowledged in *Johnson* that "7 DCMR § 223.4 (2017) provides that if an ALJ believes there is relevant and material evidence available which has not been presented at a formal hearing, the [ALJ] may order the parties to acquire and submit the evidence." 167 A.3d at 1241 (internal quotation marks omitted). We cautioned, however, that "[section] 223.4 must be read in conjunction with § 32-1520(c) and therefore permits post-hearing reopening of the record only in unusual circumstances." *Id.* (internal quotation marks omitted).

In this case, the ALJ kept the record open until August 17, 2018, to allow the Employer to submit, and to give petitioner an opportunity to respond to, a supplemental IME report from Dr. Danziger. Petitioner emphasizes, however, that the prohibition set out in § 32-1520(c) does not say that no additional information may be submitted after the close of the *record*, but states instead that none is to be submitted "after the date of the hearing" in the absence of unusual circumstances. Petitioner asserts that there were no unusual circumstances that justified accepting Dr. Danziger's supplemental report after the hearing.

We conclude that petitioner's plain-language interpretation is foreclosed by this court's decision in *Porter v. District of Columbia Dep't of Emp't Servs.*, 518 A.2d 1020 (D.C. 1986) (per curiam). Construing D.C. Code § 36-320(c) (1981) — the prior codification of § 32-1520(c) — we held that where "the record was explicitly left open for the results of the independent medical examination" and was not closed until several weeks after the hearing, "[t]he consideration of the medical report by the hearing examiner as part of the total record was proper." *Id.* at 1023. D.C. Code § 32-1520(g), cited by the CRB, supports the interpretation adopted in *Porter*; it states "[a]ll medical reports submitted by the claimant or any other interested party shall become part of the record[.]"[3] *See also King v. District of Columbia Dep't of Emp't Servs.*, 560 A.2d 1067, 1071 (D.C. 1989) (citing *Porter* as establishing that "submission of the results of an independent medical examination" is an example of an "unusual circumstance[]").

*Porter* involved the very circumstance presented here: Although the ALJ stated at the close of the hearing on July 11 that the hearing was "adjourned" (the same morning it began), he also ruled explicitly that the record would be kept open until August 10, 2018, for Dr. Danziger's supplemental IME report and petitioner's

---

[3] The CRB quoted the second sentence of § 32-1520(g) ("Copies of all medical reports submitted shall be supplied to any party upon request."), but the first sentence seems more pertinent.

response and for closing arguments. We agree with the CRB that in that circumstance, the ALJ did not err in admitting the supplemental report.

We note, however, that a portion of the CRB's reasoning — that the § 32-1520(c) prohibition applies only to *re-opening* of hearings for additional information — cannot be squared with our case law. We held in *Jones II* that the DOES Director did not err in ruling that, in the absence of unusual circumstances, § 32-1520(c) precluded holding the record open for the claimant to obtain a new medical examination. *See* 584 A.2d at 19–20. The key to reconciling our case law in this area seems to be that, consistent with what is now § 32-1520(c), a hearing officer may keep the record open to receive a report of a medical examination that has already been performed, but, except in usual circumstances, may not either keep the record open or re-open the record to await proposed additional medical examinations or for other types of information.[4] Because keeping the record open

_____

[4] Thus, in *King*, we concluded that it was not an abuse of discretion for the hearing examiner to decline to keep the record open for a physician to submit a statement about why he had selected magnetic resonance imaging, referenced in an earlier report he had submitted, *see* 560 A.2d at 1071. In *Jones II*, we upheld the DOES Director's ruling reversing the hearing examiner's decision to hold the record open for the claimant to obtain a new medical examination (a fact recounted in *Jones v. District of Columbia Dep't of Emp't Servs.*, 553 A.2d 645, 646 (D.C. 1989)) ("*Jones I*"). And in *Johnson*, we held that it was error for a newly assigned ALJ to reopen the record to allow the parties to submit evidence about the definition, symptoms, and criteria for PTSD, *see* 167 A.3d at 1239.

for Dr. Danziger's report from his July 9, 2018, examination of petitioner falls into the first of these categories, we conclude that the CRB did not err in concluding that there was no bar to the ALJ's admitting and considering the report of Dr. Danziger's supplemental IME evaluation (notwithstanding the CRB's misplaced focus on re-opening versus holding the record open).

## IV.

As the ALJ observed, the record evidence included medical reports from petitioner's treating physician Dr. Wilson and his colleagues that did not record any findings of weakness in petitioner's right elbow, or any lack of grip strength, after October 1, 2015.[5]  The ALJ noted that the November 12, 2015, report by Dr. Wilson's colleague Dr. Nwankwo and the December 10, 2015, report by his colleague Dr. Martin contain specific notations that petitioner had no right-elbow weakness.   Thus, substantial evidence supports the ALJ's finding that Dr. Danziger's opinion ("normal grip strength") was consistent with the findings of petitioner's treating physicians.

---

[5]   Reports from January 7, 2016, and February 4, 2016, do state that petitioner's "grasping" was a factor "exacerbating" petitioner's pain symptoms.

Petitioner is correct that Dr. Fechter identified the testing equipment (a dynamometer) that he used to evaluate petitioner's grip strength, while Dr. Danziger did not identify how he determined that petitioner's right-side "[g]rip strength is nearly equal to the opposite side."[6] We note, however, that Dr. Danziger did state that petitioner's "bilateral upper extremity strength is 5/5[,]" suggesting that he, too, used a measurement tool. Further, while Dr. Fechter referred to his use of a dynamometer, he offered no particular reason or context to explain why the ALJ should credit its results (which the AMA Guides suggest can be invalid for estimating impairment if the patient whose grip strength is being tested exerts less than maximal effort, and which case law suggests can be unreliable if the device is not calibrated) over the result reported by Dr. Danziger.[7] And in any event, our case law does not dictate that, to be persuasive, medical opinions must describe the particular tests physicians use for such assessments.[8] We conclude that it was neither arbitrary nor capricious for the CRB to uphold the

---

[6] The ALJ stated that Dr. Danziger "did not utilize a dynamometer," but the CRB stated, more accurately, that Dr. Danziger did not refer to a dynamometer.

[7] *See Hernandez v. Astrue*, No. C-11-2692 CW, 2012 U.S. Dist. LEXIS 138630, at *4-5 n.1 (N.D. Cal. Sept. 26, 2012) (citing an abstract discussing the "low agreement" between a certain brand of dynamometer and other instruments).

[8] *See, e.g.*, *Muhammad v. District of Columbia Dep't of Emp't Servs.*, 774 A.2d 1107 (D.C. 2001) (involving claim based on reduced grip strength).

ALJ's acceptance of Dr. Danziger's opinion over Dr. Fechter's notwithstanding that Dr. Danziger did not identify his assessment tool.

For all the foregoing reasons, we affirm the decision of the CRB.